# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| BATS A/K/A GARY PELPHREY, | : | |
| EDWARD BUCKNER, | : | |
| ROBERTO MORAES, WESLEY | : | |
| CROWE, JEFFREY SELMAN, | : | |
| MARIE SHOCKLEY, and | : | CIVIL ACTION NO. |
| ROBERTA "BOBBI" | : | 1:05-CV-2075-RWS |
| GOLDBERG, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| COBB COUNTY, GEORGIA; | : | |
| SAM OLENS, in his official | : | |
| capacity as Chairman of the Cobb | : | |
| County Commission and in his | : | |
| individual capacity; PHILLIP T. | : | |
| "MURRAY" HOMAN, in his | : | |
| official capacity as Chairman of the | : | |
| Cobb County Planning | : | |
| Commission and in his individual | : | |
| capacity, | : | |
| | : | |
| Defendants. | : | |

## ORDER

Now before the Court is Plaintiffs' Motion for Preliminary Injunction [2-1]. The Court has reviewed the record, and now enters the following Order.

**Factual Background**

Plaintiffs in this action are seven residents and taxpayers of Cobb County, Georgia, who attend and plan on continuing to attend Cobb County Government meetings, either in person or via the internet.  They brought this suit as a challenge to the County's practice of permitting "sectarian" prayers–and in particular, those that refer to "Jesus," "Jesus Christ," or "Christ"–at the opening of meetings of the County's Commission and Planning Commission (collectively, the "Commissions").

**I.      The Challenged Invocation Practice**

Cobb County, the parties in this case agree, has maintained a longstanding practice of opening the legislative sessions of its Commissions with an invocation in the form of a prayer.  It appears to be the custom of the Commissions to have a commission member introduce an individual selected to provide the invocation, and to state, "for all who wish to do so, please rise for the invocation and the Pledge [of Allegiance]."  The invited speaker then stands at the podium and recites the prayer into a microphone.  Although no systematic attempt has been made to measure the median length of the prayers, witnesses for the County state that they typically last less than one minute.

2

The individuals performing the invocations are not members of the County's Commissions, nor are they chaplains who hold any enduring office with the County.  Rather, the invitation to provide the invocation is extended to various community residents who serve as leaders at local religious institutions.

According to Defendants, administrative employees with the County (a deputy clerk and an administrative specialist) create lists comprising names of religious leaders identified in the local Yellow Pages, the internet, and on cards received from new religious institutions in the County, as well as persons who participate in the volunteer Chaplain Program for the Cobb County Fire and Police Departments.  After compiling these lists, the employees contact the religious leaders and ask if they would be interested in providing the invocation at an upcoming Commission meeting.  Once a particular, willing speaker is identified, the employees prepare a form letter confirming the speaker's attendance at the scheduled Commission or Planning Commission meeting and mail it to the speaker, postage pre-paid.  According to Defendants, the County makes no "inquiry into the content of the prayer that is to be offered," nor does it attempt to regulate the content of the invitee's speech.  The clergy, moreover, receive no payment for their time.

The record, as it now stands, does not describe the precise process employed by the County to select a speaker for any given Commission meeting.[1]  The employees involved in the scheduling process, however, have both testified that, "[i]n inviting a clergy member to provide the invocation, the particular religious affiliation or denomination of the clergy member is not [a] concern . . . ."  (See Richardson Aff. ¶ 11; Martin Aff. ¶ 11.)  Both concede that "the large majority of religious institutions in Cobb County are Christian," and that, accordingly, "the large majority of religious leaders who accept [the] invitations are Christian[,]" (see Richardson Aff. ¶ 12; Martin Aff. ¶ 12), but state that religious leaders at the County's synagogues and its mosque have likewise been invited to offer opening prayers.  They go on to say that a number of non-Christian leaders have accepted the County's invitations, and that, on more than one occasion, persons belonging to the Jewish and Muslim

---

[1] For their part, Plaintiffs allege that the County Manager "identifies clergy, chooses clergy to come to meetings, invites the clergy, and sends the clergy information about the meeting."  (See Am. Verified Compl. ¶ 25.)  Plaintiffs have not provided any further detail about their understanding of how the clergy selection process operates, however, and Defendants specifically deny "that the County Manager is personally involved in choosing clergy, inviting clergy or sending clergy information about Commission meetings."  (See Defs.' Answer to Am. Verified Compl. ¶ 25.)

faiths have offered the prayer.[2]

Plaintiffs do not dispute this point, but note that these non-Christian speakers did not include in their prayers any overt sectarian reference.  By way of contrast, Plaintiffs, focusing on meetings that took place during an eighteen month period prior to commencement of this lawsuit, have identified thirty prayers including references to "Jesus," "Christ," or "Jesus Christ" given at County Commission meetings, and point to twelve such references during Planning Commission meetings.[3]  Typically, these references were made at the conclusion of the prayer, and consisted of language such as, "in Christ's name" or "in Jesus' name we pray."[4]  Defendants do not deny that such references

_____

[2] Defendants state that they have not yet completed a review of invocations to determine how many were offered by non-Christian clergy.  According to Plaintiffs, however, in the year and a half that preceded this lawsuit, only four non-Christian clergy gave the invocation at County Commission meetings, and only one non-Christian speaker offered the opening prayer at the meetings held by the Planning Commission.

[3] To provide some perspective, the Cobb County Commission meets three times a month, while the Planning Commission holds meetings once each month except during the month of January.  Thus, assuming the eighteen month period selected by Plaintiffs presents a fairly representative sample, it would appear that a reference to Christ is made during approximately 75% of the invocations offered in the meetings of the County Commissions.

[4] Not all references to Christ have been quite so isolated or laconic.  (See Am. Verified Compl. ¶ 33 (concluding prayer, "send us the Holy Spirit, endow us, baptize us, and keep us this day . . . in the jubilous [sic] name of the Father, Son, and Holy Spirit of a

AO 72A
(Rev.8/82)

were made, but point out that many invocations, even by Christian clergy, did

not include any reference to Christ, and observe that, in any event, "the quoted

language was one small fraction of the words used by the clergy member."  (See

Answer ¶¶ 29-75.)

## II.    Plaintiffs' Request that Sectarian References be Removed and the Ensuing Litigation

According to testimony offered by Defendants, the invocation practice

has not been the subject of controversy within the Commissions, and continues

under the unanimous consent of the commission members (who themselves are

not of homogeneous sectarian affiliation).  (See Olens Aff. ¶ 23 (observing that

Commission Chairman is a member of the Jewish faith).)  At least two of the

Plaintiffs, however, have voiced their opposition to the practice during public

---

living God.  Amen."); see also id. ¶¶ 40 (including phrases, "the man Jesus Christ," "we ask you Lord Jesus," "I thank you Jesus in your holy name," and "In your name Jesus we pray."); 48 ("We pray for the Commissioners that they will have the wisdom of Solomon and the compassion of Christ . . . .  We pray that we will be a country that honors you and your laws and your love . . .  We pray Father that you help us to see that you are the sovereign Lord of the Universe . . . In Jesus name.  Amen."), 65 ("We pray that the spirit of Jesus Christ, our Lord and Savior will direct everything that is said and done in this place today.")  A review of the more than forty prayers cited in Plaintiffs' Compliant (out of the more than fifty that were offered during the relevant period), however, reveals that more elaborate or repetitive Christian references were unusual, and were contained in only a minority of the prayers.

comment sessions, relating to members of the Commission their view that the

sectarian references in the prayers violate the Unites States Constitution and,

further, were personally offensive to them.  The American Civil Liberties Union

("ACLU") lodged similar grievances, and requested that the County remove all

sectarian references from the invocations.

The County, notwithstanding the ACLU's admonition that failure to

change its policies would "embroil the County in costly and lengthy litigation[,]"

declined to alter its policies and forbid all sectarian references in the invocational

prayers.  (See Am. Verified Compl. at Ex. G.)  In light of Defendants'

unwillingness to implement the requested reforms, Plaintiffs brought this suit on

August 10, 2005.  In their Complaint, as amended, they articulate their grievance

as follows:

> The Plaintiffs object to the sectarian prayers at Cobb
> County government meetings because they invoke a
> specific god – a Christian God – to the exclusion of
> all other Gods.  The Plaintiffs are offended and often
> feel repressed by this practice.  Each time they attend
> a government meeting the Plaintiffs are affronted by
> Defendants' overtly Christian prayers and subject to
> unavoidable and unwelcome religious messages
> sponsored by the County.  Mr. Pelphrey believes that
> the government's use of sectarian prayer is demeaning
> to his religion.  The prayers cause other Plaintiffs to

7

> feel like outsiders in their own community and
> unwelcome at government meetings.  Furthermore,
> they are offended because the sectarian prayers are an
> unconstitutional endorsement of religion and because
> the prayers trivialize religion.

(<u>See</u> Am. Verified Compl. ¶ 18.)  Plaintiffs ask that this Court declare

Defendants "sponsorship of sectarian prayers" at Cobb County government

meetings violative of the United States and Georgia Constitutions; enjoin

Defendants from "knowingly and intentionally allowing sectarian prayers at

County government meetings, making any further expenditures of public funds,

and taking any further action to sponsor sectarian prayers at Cobb County

government meetings[,] and requiring . . . Defendants, their successors, and

assigns to advise anyone conducting a prayer as part of the City Council

meeting that sectarian prayers are not permitted"; as well as nominal damages,

costs, and fees.  (<u>See</u> Am. Verified Compl. at Prayer for Relief.)

**Discussion**

**I.      Preliminary Injunction Standard**

A preliminary injunction is an "extraordinary and drastic remedy[.]"

<u>Zardui-Quintana v. Richard</u>, 768 F.2d 1213, 1216 (11th Cir. 1985).  To obtain

such relief, a movant must demonstrate:

8

> (1) a substantial likelihood of success on the merits of
> the underlying case, (2) the movant will suffer
> irreparable harm in the absence of an injunction, (3)
> the harm suffered by the movant in the absence of an
> injunction would exceed the harm suffered by the
> opposing party if the injunction issued, and (4) an
> injunction would not disserve the public interest.

Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242,

1246-47 (11th Cir. 2002).  To determine whether Plaintiffs have met their burden

in this case, the Court begins by examining the substantive law applicable to this

controversy and evaluating Plaintiffs' likelihood of success in light of that

authority.

## II.    Substantial Likelihood of Success

Plaintiffs charge that Defendants' practice of "permitting" sectarian

references during invocational prayers violates the proscriptions of the

Establishment Clause of the United States Constitution and two provisions of

the Georgia Constitution.  The Court addresses Plaintiffs' likelihood of

succeeding on each constitutional challenge separately.

9

**A.      The Establishment Clause**

   1.      <u>A review of applicable authorities</u>

      a.      <u>Lemon and Marsh</u>

   The Establishment Clause of the First Amendment, made applicable to

the states through the Fourteenth Amendment, <u>see</u> <u>Everson v. Bd. of Educ.</u>, 330

U.S. 1, 15, 67 S. Ct. 504, 91 L. Ed. 711 (1947), provides that the government

"shall make no law respecting an establishment of religion."  U.S. CONST.

amend. I.  In order for a challenged practice to pass Establishment Clause

muster, it typically must satisfy the tripartite standard articulated by the Supreme

Court in <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745

(1971).  That is, the practice must have a valid secular purpose, not have the

effect of advancing or inhibiting religion, and not foster excessive government

entanglement with religion.  <u>Id.</u> at 612-13; <u>see also</u> <u>Glassroth v. Moore</u>, 335 F.3d

1282, 1295 (11th Cir. 2003).

   In the years since the Court announced its holding in <u>Lemon</u>, the

decision's analytical framework has become subject to much criticism, <u>see</u>

<u>Glassroth</u>, 335 F.3d at 1295 ("We follow the tradition in this area by beginning

with the almost obligatory observation that the <u>Lemon</u> test is often maligned."),

10

and, even more important for purposes here, at least one prominent exception.

In Marsh v. Chambers, 463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019

(1983), the Supreme Court, considering whether a state violates the

Establishment Clause by opening each legislative day with a prayer given by a

paid chaplain, declined to apply Lemon, and instead addressed, and upheld, the

constitutional viability of legislative prayer through an examination of historical

practice.  See Marsh, 463 U.S. at 783-95 (acknowledging Eighth Circuit Court

of Appeal's application of Lemon to strike down legislative prayer, but

nevertheless affirming practice without reference to Lemon); cf. also id. at 796

(Brennan, J., dissenting) ("[T]he Court is carving out an exception to the

Establishment Clause rather than reshaping Establishment Clause doctrine to

accommodate legislative prayer.").  It therefore placed legislative prayer on

unique footing in the landscape of First Amendment jurisprudence.  See, e.g.,

Simpson v. Chesterfield County Bd. of Supervisors, 404 F.3d 276, 281 (4th

Cir. 2005) ("Marsh, in short, has made legislative prayer a field of Establishment

Clause jurisprudence with its own set of boundaries and guidelines."); Snyder v.

Murray City Corp., 159 F.3d 1227, 1232 (10th Cir. 1998) (en banc) ("[T]he

evolution of Establishment Clause jurisprudence indicates that the

11

constitutionality of legislative prayers is a *sui generis* legal question . . .  [T]he

kind of legislative prayers at issue in <u>Marsh</u> simply would not have survived the

traditional Establishment Clause tests that the Court had relied on prior to <u>Marsh</u>

and has continued to rely on in different contexts since <u>Marsh</u>.”); <u>see also</u> <u>Van</u>

<u>Orden v. Perry</u>, — U.S. —, 125 S. Ct. 2854, 2869, 162 L. Ed. 2d 607 (2005)

(Breyer, J., concurring) (“Neither can this Court’s other tests readily explain the

Establishment Clause’s tolerance, for example, of prayers that open legislative

meetings, <u>see</u> <u>Marsh</u> . . . .”).[5]

In <u>Marsh</u>, a Nebraska legislator brought suit challenging the State

Legislature’s practice of opening each daily session with the delivery of an

invocation by a paid chaplain.  Rejecting his challenge, and affirming the

constitutionality of the practice, the Court began with the observation that “[t]he

opening of sessions of legislative and other deliberative public bodies with

---

[5] Plaintiffs urge that the “exception” to <u>Lemon</u> carved out by <u>Marsh</u> is for “*nonsectarian* legislative prayer,” and that outside this limited context, the Supreme Court’s decision in <u>Lemon</u> governs the constitutionality of the practice.  Insofar as Plaintiffs’ position is that a legislative prayer practice that offends the constitutional limits articulated in <u>Marsh</u> must be evaluated, and struck down, under principles akin to those embodied in <u>Lemon</u>, the Court agrees.  But the Court declines to endorse a reading of <u>Marsh</u> that reduces the majority’s holding to a mere “sectarian” litmus test, ignoring the reasoning and nuances of the Court’s decision in favor of a bright line rule.

prayer is deeply embedded in the history and tradition of this country."  Marsh, 463 U.S. at 786.  It emphasized the First Congress's near concomitant approval of the language that would ultimately constitute the Bill of Rights and its authorization of the appointment of paid chaplains, and remarked, "It can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a Chaplain for each House and also voted to approve the draft of the First Amendment for submission to the States, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable."  Id. at 790.  "In light of the unambiguous and unbroken history of more than 200 years," the Court reasoned, "there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society.  To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country."  Id. at 792.

Notwithstanding its recognition of the deeply rooted historical precedent for legislative prayer, the majority in Marsh did not suggest that the practice was entirely free from Establishment Clause restraint.  See Marsh, at 792 ("We turn

then to the question of whether any features of the Nebraska practice violate the Establishment Clause.").  Rather, it went on to consider the respondent's three specific challenges to the Nebraska practice; namely, "that a clergyman of only one denomination–Presbyterian–ha[d] been selected for 16 years" to provide the invocations; that the chaplain had been paid for his services with public funds; and that the prayers recited were "in the Judeo-Christian tradition."  Id. at 793.  It ultimately rejected each, but in doing so, alluded to the boundaries that constitutionally acceptable legislative prayer may not transgress.  Its reasoning *vis-a-vis* the respondent's first and third arguments is particularly important to the instant case.

　　　　First, in declining to invalidate the Nebraska Legislature's practice on the basis of the sustained use of one, Presbyterian clergyman to deliver the invocation, the Court held that the "long tenure" enjoyed by an adherent to a particular denomination did not improperly "ha[ve] the effect of giving preference to [that person's] religious views[,]" nor did it "advance[ ] the beliefs of a particular church."  See id. at 793-94.  Instead, pointing to the similarly lengthy tenures enjoyed by certain United States Senate chaplains, and acknowledging that clergymen other than the Presbyterian minister had

14

occasionally been invited to offer the invocation, the Court stated,

>    Absent proof that the chaplain's reappointment
>    stemmed from an impermissible motive, we conclude
>    that his long tenure does not in itself conflict with the
>    Establishment Clause.

Id. at 793-94.

The majority also rejected the respondent's contention that the prayers,

offered as they were "in the Judeo-Christian tradition," ran afoul of the

Establishment Clause.  It began by explaining, in a footnote, that the chaplain

himself had characterized his prayers as "'nonsectarian,'[6] 'Judeo Christian,'

and with 'elements of the American civil religion.' "  Id. at 793 n.14.  It

continued, in the same footnote, "[a]lthough some of his earlier prayers were

often explicitly Christian, [Chaplain] Palmer removed all references to Christ

after a 1980 complaint from a Jewish legislator."  Id.

After providing that background for the respondent's attack, the Court,

with little explanation, rejected the argument that legislative prayers offered "in

the Judeo-Christian tradition" offended the Establishment Clause.  It stated,

---

[6]Notably, this description of the prayers as "nonsectarian," offered by Chaplain
Palmer, is the sole reference made to the "sectarian" character *vel non* of the subject
prayers in the Marsh majority's opinion.

without preface or further elaboration,

> The content of the prayer is not of concern to judges
> where, as here, there is no indication that the prayer
> opportunity has been exploited to proselytize or
> advance any one, or to disparage any other, faith or
> belief.  That being so, it is not for us to embark on a
> sensitive evaluation or to parse the content of a
> particular prayer.

Id. at 795.  With that final admonition, the six-Justice majority reversed the

Eighth Circuit's decision to enjoin the chaplaincy practice maintained by the

Nebraska Legislature.

> b.      The Supreme Court's Decisions After Marsh

In the years that followed the Marsh decision, the Supreme Court twice

considered, albeit largely in dicta, issues implicating the holding of Marsh, and in

each expounded upon the principles that should govern the lower courts'

Establishment Clause analysis.  See Lee v. Weisman, 505 U.S. 577, 112 S. Ct.

2649, 120 L. Ed. 2d 467 (1992); County of Allegheny v. ACLU, 492 U.S. 573,

109 S. Ct. 3086, 106 L. Ed. 2d 472 (1989).  The Court reviews the pertinent

portions of those decisions here.

It begins with Allegheny.  There, the Supreme Court considered the

ACLU's Establishment Clause challenge to the display of a crèche in a county

courthouse and a menorah outside a government building.  In an opinion

authored by Justice Blackmun, a five-Justice majority struck down the crèche

display (but not the menorah, which was accompanied by a Christmas tree) as

unconstitutional.[7]

The majority rejected Justice Kennedy's position, authored in dissent and

joined by the remainder of the Court, that the Establishment Clause should be

---

[7]The Allegheny opinion was notably fractured:

> BLACKMUN, J., announced the judgment of the Court and
> delivered the opinion of the Court with respect to Parts III-A,
> IV, and V, in which BRENNAN, MARSHALL, STEVENS, and
> O'CONNOR, JJ., joined, an opinion with respect to Parts I
> and II, in which STEVENS and O'CONNOR, JJ., joined, an
> opinion with respect to Part III-B, in which STEVENS, J.,
> joined, an opinion with respect to Part VII, in which
> O'CONNOR, J., joined, and an opinion with respect to Part
> VI. O'CONNOR, J., filed an opinion concurring in part and
> concurring in the judgment, in Part II of which BRENNAN and
> STEVENS, JJ., joined, . . . .  BRENNAN, J., filed an opinion
> concurring in part and dissenting in part, in which
> MARSHALL and STEVENS, JJ., joined, . . . .  STEVENS, J.,
> filed an opinion concurring in part and dissenting in part, in
> which BRENNAN and MARSHALL, JJ., joined, . . . .
> KENNEDY, J., filed an opinion concurring in the judgment in
> part and dissenting in part, in which REHNQUIST, C.J., and
> WHITE and SCALIA, JJ., joined . . . .

Allegheny, 109 S. Ct. at 3092-93.  The only portions of the opinion relevant for the Court's purposes here, however, are contained in Parts III-A and V, both of which gained majority (5-4) support.

AO 72A
(Rev.8/82)

construed to permit "[n]oncoercive government action within the realm of

flexible accommodation or passive acknowledgment of existing symbols . . .

unless it benefits religion in a way more direct and more substantial than

practices that are accepted in our national heritage." See Allegheny, 492 U.S. at

604-05 (rejecting position taken by dissent) & 662-63 (Kennedy, J., dissenting).

In doing so, the five-Justice majority, comprised in part of the three Marsh

dissenters, took issue with Justice Kennedy's apparent reliance on Marsh:

> However history may affect the constitutionality of
> nonsectarian references to religion by the government,
> history cannot legitimate practices that demonstrate
> the government's allegiance to a particular sect or
> creed.
>
> Indeed, in Marsh itself, the Court recognized that not
> even the "unique history" of legislative prayer [cit.]
> can justify contemporary legislative prayers that have
> the effect of affiliating the government with any one
> specific faith or belief.  [Marsh, 463 U.S. at 794-95.]
> The legislative prayers involved in Marsh did not
> violate this principle because the particular chaplain
> had "removed all references to Christ."  [Cit.]  Thus,
> Marsh plainly does not stand for the sweeping
> proposition Justice KENNEDY apparently would
> ascribe to it, namely, that all accepted practices 200
> years old and their equivalents are constitutional today.

Allegheny, 492 U.S. at 603.  It continued,

18

> Whatever else the Establishment Clause may mean
> (and we have held it to mean no official preference
> even for religion over nonreligion, [cit.]), it certainly
> means at the very least that government may not
> demonstrate a preference for one particular sect or
> creed (including a preference for Christianity over
> other religions).  "The clearest command of the
> Establishment Clause is that one religious
> denomination cannot be officially preferred over
> another." Larson v. Valente, 456 U.S. 228, 244, 102
> S. Ct. 1673, 1683, 72 L. Ed. 2d 33 (1982).  There
> have been breaches of this command throughout this
> Nation's history, but they cannot diminish in any way
> the force of the command.

Allegheny, 492 U.S. at 605.

Allegheny, then, both provides a novel perspective on the outcome of

Marsh (albeit in the context of a constitutional challenge brought under the

distinct Lemon paradigm), and elucidates an overarching principle of

constitutional law that governs Establishment Clause claims brought under either

Marsh or Lemon.  With respect to the latter, the Allegheny majority underscored

that, even in those cases where the tripartite analysis of Lemon does not govern,

the Establishment Clause demands that the government not "demonstrate" an

"official preference" for one religious group to the exclusion of others.  Id.  As

it relates to the former, reflecting on Marsh, the Allegheny majority postulated

19

that the case was decided as it was "because" the "particular chaplain" there had

agreed to remove explicit references to Christ from his invocation, suggesting

that, absent such a revision, the practice of the Nebraska Legislature would have

impermissibly conveyed the appearance of an official sectarian preference.

Three years after Allegheny, the Supreme Court once again had the

opportunity to expound on the constitutional principles prominent in its Marsh

holding, this time with Justice Kennedy authoring the majority opinion.  In Lee v.

Weisman (5-4 decision),[8] the Court upheld an injunction prohibiting a public

school system from including invocational prayers and benedictions during

graduation ceremonies.  It did so notwithstanding the school officials' effort to

discourage prayers with overt sectarian content by distributing a pamphlet

entitled, "Guidelines for Civic Occasions," which "recommend[ed] that public

---

[8]Although not as fractured as Allegheny, the Lee decision continued to reflect the many divergent views held by the Justices of the Court vis-a-vis the Establishment Clause:

> KENNEDY, J., delivered the opinion of the Court, in which BLACKMUN, STEVENS, O'CONNOR, and SOUTER, JJ., joined. BLACKMUN, J., . . . , and SOUTER, J., . . . , filed concurring opinions, in which STEVENS and O'CONNOR, JJ., joined. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C.J., and WHITE and THOMAS, JJ., joined, [cit.].

Lee, 112 S. Ct. at 2652

20

prayers at nonsectarian civic ceremonies be composed with 'inclusiveness and sensitivity,' " and through express admonitions to speakers that their prayers be "nonsectarian." <u>See</u> <u>Lee</u>, 505 U.S. at 581.

Noteworthy for purposes of the instant case, the Supreme Court found the officials' attempts to ensure nonsectarian content not only inadequate to avoid an Establishment Clause violation, but suspect in their own right, explaining:

> Principal Lee provided Rabbi Gutterman with a copy of the "Guidelines for Civic Occasions," and advised him that his prayers should be nonsectarian.  Through these means the principal directed and controlled the content of the prayers.  Even if the only sanction for ignoring the instructions were that the rabbi would not be invited back, we think no religious representative who valued his or her continued reputation and effectiveness in the community would incur the State's displeasure in this regard.  It is a cornerstone principle of our Establishment Clause jurisprudence that "it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government," <u>Engel v. Vitale</u>, 370 U.S. 421, 425, 82 S. Ct. 1261, 1264, 8 L. Ed.2d 601 (1962), and that is what the school officials attempted to do.
>
> . . .

> We are asked to recognize the existence of a practice
> of nonsectarian prayer, prayer within the embrace of
> what is known as the Judeo-Christian tradition, prayer
> which is more acceptable than one which, for
> example, makes explicit references to the God of
> Israel, or to Jesus Christ, or to a patron saint. There
> may be some support, as an empirical observation . . .
> that there has emerged in this country a civic religion,
> one which is tolerated when sectarian exercises are
> not.  [Cits.]  If common ground can be defined which
> permits once conflicting faiths to express the shared
> conviction that there is an ethic and a morality which
> transcend human invention, the sense of community
> and purpose sought by all decent societies might be
> advanced.  But though the First Amendment does not
> allow the government to stifle prayers which aspire to
> these ends, neither does it permit the government to
> undertake that task for itself.

Lee, 505 U.S. at 588-89.  In this way, the Court's opinion in Lee voices

concerns of entanglement akin to those expressed by the Marsh majority, where

the Court had cautioned that, absent an "indication that the [legislative] prayer

opportunity has been exploited to proselytize or advance any one, or to

disparage any other, faith or belief[,]" it was not the role of the government

(there, the judiciary) "to embark on a sensitive evaluation or to parse the content

of a particular prayer."  Marsh, 463 U.S. at 795.

      c.      Marsh's Progeny: The Lower Courts

22

Following <u>Lee</u>, the lower courts have struggled with whether, and to what extent, sectarian references should be permitted in the sphere of public prayer, especially when the speech at issue occurs outside the confines of the nation's academic institutions.  The reported decisions, though perhaps not irreconcilable in their disposition, have failed to reach any consensus on the permissibility of a speaker mentioning the name of a particular deity–a debate that is often couched in terms of whether <u>Marsh</u> allows any invocation that does not rise to the level of theological opaqueness required of "nonsectarian" prayer. For the sake of brevity, the Court concentrates on two illustrative, albeit conflicting decisions here.

First, in <u>Snyder v. Murray City Corp.</u>, 159 F.3d 1227 (10th Cir. 1998) (<u>en banc</u>), the Tenth Circuit upheld a city council's decision to disallow a particular speaker from providing an invocation on the basis of content.  Historically, the council had permitted prayer at the beginning of its meetings, and had invited members of many faiths to provide the invocation without any direction or guidance respecting the content of the prayer.  <u>See</u> <u>Snyder</u>, 159 F.3d at 1228 ("Those prayers had been offered by members of the religious communities in and around Murray City, including various members of Judeo-Christian

23

congregations, Zen Buddhists, and Native Americans.").  The plaintiff, however,

had not been solicited to perform the invocation, but rather approached the city

with a request to recite a somewhat unconventional "prayer."[9]  When the council

---

[9]The proposed prayer would have consisted, in part, of the following:

> OUR MOTHER, who art in heaven (if, indeed there is a heaven and if there is a god that takes a woman's form) hallowed be thy name, we ask for thy blessing for and guidance of those that will participate in this meeting and for those mortals that govern the state of Utah;

> . . .

> We pray that you prevent self-righteous politicians from mis-using the name of God in conducting government meetings; and, that you lead them away from the hypocritical and blasphemous deception of the public, attempting to make the people believe that bureaucrats' decisions and actions have thy stamp of approval if prayers are offered at the beginning of government meetings;

> . . .

> We ask that you deliver us from the evil of forced religious worship now sought to be imposed upon the people of the state of Utah by the actions of mis-guided, weak and stupid politicians, who abuse power in their own self-righteousness;

> All of this we ask in thy name and in the name of thy son (if in fact you had a son that visited Earth) for the eternal betterment of all of us who populate the great state of Utah.

> Amen.

Snyder, 159 F.3d at 1228 n.3.

24

denied the request, he filed suit.

The Tenth Circuit, sitting *en banc*, concluded the prayer proposed by the speaker fell outside of the constitutional boundaries established by the Supreme Court, in that it did not comport with the traditional genre of legislative prayer approved by <u>Marsh</u>, and in fact could fairly be understood as "proselytizing" the speaker's own religious views and "disparaging" those of others.  <u>See</u> <u>Snyder</u>, 159 F.3d at 1236.  Thus, it held that he suffered no cognizable injury under the Constitution in being denied the opportunity to deliver his speech at the council meeting.

Before reaching this result, however, the Tenth Circuit endeavored to articulate, with greater practical precision, the limits placed on constitutionally permissible legislative prayer by <u>Marsh</u> and its progeny.  Rejecting the proposition that "the mere fact a prayer evokes a particular concept of God is . . . enough to run afoul of the Establishment Clause[,]" the court concluded that legislative prayer violates the Constitution only when it "proselytizes a particular religious tenet or belief, or . . . *aggressively advocates* a specific religious creed, or . . . derogates another religious faith or doctrine."  <u>Snyder</u>, 1234 & n.10 (interpreting language in <u>Marsh</u> forbidding the "exploit[ation]" of the prayer

opportunity to "proselytize or advance any one, or to disparage any other, faith or belief").[10]   Concentrating specifically on <u>Marsh</u>'s proscription against "advance[ment]," the Tenth Circuit held that the <u>Marsh</u> Court's juxtaposition of the proselytization language with the "or advance" clause shed light on the proper construction to be given the latter term, indicating that the core prohibition in <u>Marsh</u> was directed at the inducement of listeners to adopt or convert to a particular faith.  <u>See</u> <u>id.</u> at 1234 n.10 ("what is prohibited by the clause is a more aggressive form of advancement, i.e., proselytization").[11]

---

[10]   The District Court for the District of Columbia, in <u>Newdow v. Bush</u>, 355 F. Supp. 2d 265 (D.D.C. 2005), appeared to reach a similar conclusion.  <u>See</u> <u>Newdow</u>, 355 F. Supp. 2d at 289   (isolated sectarian references, without more, were insufficient to find prayer violated prohibitions of <u>Marsh</u>).

[11]Plaintiffs argue that the cited language from the Tenth Circuit's opinion reveals a flaw in its reasoning, stating that the court was essentially "reading out" of <u>Marsh</u> the "or advance" clause–entirely conflating the concepts of advancement and proselytization.  To be sure, this language from the footnote in <u>Snyder</u> ("i.e., proselytization") is unfortunate.  But the Court does not believe that the language must, or should, be read to "expose" such an error.  Rather, the Court believes the better reading of <u>Snyder</u> is that, rightly or wrongly, the Tenth Circuit saw the "or advance" clause as simply a more mutable and slightly broader formulation of the proselytization concept–an attempt by the Supreme Court to expand the reach of its prohibition beyond the strictest connotation of "proselytization[,]" while nevertheless maintaining the same core prohibition against the overt advocacy of a single sect's views.   Put another way, the Tenth Circuit appeared to read the inclusion of the "or advance" clause as an attempt by the Supreme Court to "blur" the otherwise confined lines around the periphery of the proselytization prohibition and ensure that actors would not skirt the impact of its holding in <u>Marsh</u> by omitting only the overt calls to conversion that are customarily understood as "proselytizing" efforts.

The Fourth Circuit articulated a much different understanding of <u>Marsh</u> in

<u>Wynne v. Town of Great Falls</u>, 376 F.3d 292 (4th Cir. 2004).  There, the

plaintiff filed suit challenging a town council's practice of having a council

member lead meeting attendees in prayer, and "frequently" invoking Jesus

during the course of such prayers.  <u>See</u> <u>Wynne</u>, 376 F.3d at 295 (recounting

plaintiff's testimony that, during invocation, "there were 'a lot of "amens,"'

[and] that 'it was a very church environment' ").  Upholding the district court's

injunction against the Town Council's further invocation of "the name of a

specific deity associated with any one specific faith or belief in prayers given at

Town Council meetings[,]" the Fourth Circuit found that the Town Council had

"exploited" the prayer opportunity to "affiliate" itself with, 376 F.3d at 298, to

"advance," <u>id.</u>, and to "proselytize or advance," <u>id.</u> at 299 n.4, Christianity to

the exclusion of other faiths.  <u>See id.</u>, 376 F.3d at 298-99.

In support, the Fourth Circuit emphasized, *inter alia*, that the council

members themselves, in delivering opening prayers, had frequently made

references to Christ (and did not appeal to deities of any other faith); that the

plaintiff had been publicly chided by a council member for failing to stand for

the prayer along with other attendees; and that the plaintiff became the subject of

council member-induced criticism in the community regarding her opposition to the invocation practice.  Id. at 295-301; see also id. at 298 n.4.  It did not, however, purport to limit its holding to similarly egregious facts.[12]  Rather, it read the "or advance" clause in Marsh, in view of Allegheny, to broadly proscribe any legislative prayer "contain[ing] explicit references to a deity in whose divinity only those of one faith believe."  Id. at 301; see also id. ("The

---

[12]Notably, the Fourth Circuit in a more recent decision placed greater emphasis on the facts of Wynne than on its broader pronouncement that any reference to a particular deity is constitutionally impermissible.   In Simpson v. Chesterfield County Board of Supervisors, 404 F.3d 276 (4th Cir. 2005), the court approved a legislative prayer practice in which various clergy in the county's religious community were invited to present invocations during meetings of the county board of supervisors.   Finding the practice constitutionally acceptable, the Simpson court noted, inter alia, that the county had sought "to avoid the slightest hint of sectarianism, [and had] revised its invitation letter to clergy" after litigation began to request that Christian clerics avoid making reference to   Jesus Christ.  Simpson, 404 F.3d at 279.  It did not, however, seem to reason that such a revision was an absolute prerequisite to the invocational practice's constitutionality, nor did it invoke the language of Wynne appearing to proscribe any explicit reference to a deity associated with a particular faith.  Instead, it compared the case before it with the facts of Wynne, emphasizing that, "[i]n Wynne, sectarian references in invocations were far more than occasional or incidental[,]" and that the prayers at issue there were "pervasively and exclusively sectarian in nature."  Id. at 283.  The court shone new light on Wynne's holding, stating that the earlier decision "was concerned that repeated invocation of the tenets of a single faith undermined [the] commitment to participation by persons of all faiths in public life."  Id. (emphasis supplied).

invocations at issue here, which specifically call upon Jesus Christ, are simply

not constitutionally acceptable legislative prayer like that approved in <u>Marsh</u>.").[13]

2.     <u>Arriving at the applicable standards</u>

As the foregoing discussion illustrates, the slate upon which this Court

writes here is neither blank nor especially clear.  On the one hand, the Supreme

Court has cautioned legislatures and lower courts alike to refrain from becoming

embroiled in the regulation or review of the content of prayer, even when that

prayer is offered before a public body or at a government sponsored event.  On

the other, it has indicated that, while prayers at legislative gatherings are

_____

[13]Other courts have reached similar conclusions.  <u>See</u> <u>Hinrichs v. Bosma</u>, 400 F. Supp. 2d 1103, 1125-28 (S.D. Ind. 2005) (reading <u>Marsh</u> to proscribe references to Jesus Christ in legislative prayers; holding unconstitutional prayer practice that frequently resulted in proselytizing prayers); <u>see also</u> <u>Stein v. Plainwell Community Schs.</u>, 822 F.2d 1406, 1409 (6th Cir. 1987) (applying <u>Marsh</u> to case involving school commencement invocation, held that allowance of public prayer was limited to those prayers that "do[ ] not go beyond the 'American civil religion' "); <u>Rubin v. City of Burbank</u>, Cal. Rptr. 2d 867, 874-75 (Cal. Ct. App. 2003) (holding that references to Jesus Christ necessarily resulted in conclusion that invocation opportunity had been impermissibly exploited to "advance" one faith, and, without considering <u>Lee</u>, concluded that city should be compelled to "advise those who volunteer to give the council invocation that sectarian prayers are not permitted"); <u>cf.</u> <u>Bacus v. Palo Verde Unified Sch. Dist. Bd. of Edu.</u>, 52 Fed. Appx. 355, 356-57 (9th Cir. 2002) (unpublished decision) (holding that "the [challenged] prayers, almost always 'in the Name of Jesus,' did [impermissibly] advance one faith"; but issuing caveat, "we need not decide whether the prayers 'in the Name of Jesus' would be a permissible solemnization of a legislature-like body, provided that invocations were, as is traditional in Congress, rotated among leaders of different faiths, sects, and denominations").

permissible, at some point the government's provision of a prayer opportunity may breach a constitutionally tolerable line by, for example, demonstrating a preference on the part of the government for a particular sect or creed to the exclusion of other faiths.

The location of that line, like in other areas of Establishment Clause jurisprudence, is not particularly well marked, and has been the subject of spirited debate among the Justices of the Supreme Court in the years since Marsh.  While this Court does not purport to act as a comprehensive cartographer of the permissible boundaries of legislative prayer, it takes this opportunity, before focusing on the specific facts of this case, to articulate what it perceives as the standards that must guide its inquiry.

a.      Impermissible motive

The first boundary erected to legislative prayer by the Supreme Court relates to the intent of the legislature in its selection of the speaker meant to deliver the invocation.  In Marsh, the respondent argued that the Nebraska Legislature's practice violated the Establishment Clause because the same Presbyterian clergyman had delivered the opening prayers for sixteen years. Quickly disposing of this argument, the Court rejected the idea that "choosing a

clergyman of one denomination advances the beliefs of a particular church."

<u>Marsh</u>, 463 U.S. at 793.  After underscoring that "guest chaplains have

officiated at the request of various legislators and as substitutes during Palmer's

absences[,]" the Court went on to hold:  "*Absent proof  that the chaplain's*

*reappointment stemmed from an impermissible motive*, we conclude that his

long tenure does not in itself conflict with the Establishment Clause."  <u>Id.</u> at 793-

94 (emphasis supplied).

   The Court did not elaborate in <u>Marsh</u> on what motive or motives it would

find "impermissible."  Read in context, however, the "impermissible motive"

prohibition seems directed at the conscious selection of a speaker from one

denomination or sect for the purpose of promoting or endorsing the beliefs held

by that speaker.  That is, the Court appeared to deem constitutionally

unacceptable the selection and retention of a particular speaker *because* of that

speaker's sectarian affiliation or religious beliefs.  <u>See</u> <u>Marsh</u>, 463 U.S. at 793

(legislature acted properly in retaining chaplain where decision to do so was

motivated by "*his* performance and personal qualities[,]" rather than on intent to

"advance[ ] the beliefs of a particular church") (emphasis supplied).

31

The Court indicated, moreover, that the bar for proving such impermissible motive is quite high.  It found the virtually uninterrupted sixteen year tenure of a single Presbytrian minister insufficient to demonstrate any "preference" for a particular faith.  Instead, it appeared to envision more pronounced evidence of a legislative purpose to sanction one religious viewpoint as a necessary predicate for declaring a legislature's selection of clergy a violation of the Establishment Clause.

        b.     Exploitation of the prayer opportunity to "proselytize or advance any one, or to disparage any other, faith or belief"

The second boundary the Supreme Court set for constitutionally acceptable legislative prayer is found in two oft-quoted sentences in Marsh:

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.  That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

Marsh, 463 U.S. at 795.  With that, the Supreme Court rejected the Marsh respondent's contention that prayers offered "in the Judeo-Christian tradition" offended the Establishment Clause.  Although the Court declined to elaborate on

this portion of its reasoning, a careful reading of the opinion illuminates three critical features of the Court's holding.

First, Marsh acknowledged that the chaplain retained by the Nebraska Legislature had removed "all references to Christ after a 1980 complaint from a Jewish legislator." Marsh, 463 U.S. at 793 n.14. Supplications to an identified deity were therefore within the Court's contemplation as it authored its holding. This notwithstanding, the Court did not articulate a clear proscription against overt sectarian references. Indeed, the only reference to the "sectarian" or "nonsectarian" content of the prayers in the Marsh majority's opinion can be found in a footnote relating how Chaplain Palmer had described his invocations, inserted to explain what the respondent meant in describing the challenged prayers as "in the Judeo-Christian tradition." Id.

What the Court did say, instead, was that the practice of legislative prayer would run afoul of the Establishment Clause only when it was "exploited" to disparage other faiths, or to exceed a more amorphous threshold of "proselytiz[ation] or advance[ment.]" See id. at 794-95. Below this threshold, the Court disclaimed any interest in the content of legislative invocations,

announcing a strong disinclination "to embark on a sensitive evaluation or to

parse the content of a particular prayer."  Id.

　　　　The absence of any language explicitly forbidding references to a

particular deity when Chaplain Palmer's inclusion and ultimate removal of such

references had been brought to the attention of the Justices suggests, in the view

of this Court, that the majority in Marsh did not see such references as *per se*

unconstitutional.  Moreover, an express disinclination to "evaluate" or to

"parse" the content of legislative prayer beneath a certain threshold necessarily

indicates that there exists *something* beneath that threshold.  If the bare

identification of the deity to whom a speaker directs his or her prayer (*e.g.*, "in

Jesus' name") does not occupy such a space, then this Court struggles to

discern what that "something" might be.[14]

_____

　　　　[14]The Court finds unpersuasive the Fourth Circuit's assertion in Wynne that no undesirable "evaluation" or "parsing" occurs when a court merely reviews a prayer for overt sectarian concepts, like references to Jesus.  See Wynne, 376 F.3d at 298 n.4 ("In the analysis that follows, we have not engaged in any such 'parsing' but instead simply rely on the district court's factual finding that the challenged prayers 'frequently' invoked ' "Jesus," "Jesus Christ," "Christ," or "Savior." ' ").  It would seem anomalous for the outcome of the Marsh inquiry to turn on the obviousness or subtlety of the sectarian references in question; such a rule would create the perverse incentive for speakers to endeavor to couch sectarian concepts in opaque terms, and place courts in the unenviable position of determining just how "obvious" a sectarian reference has to be before it must be excised from legislative invocations, even when not otherwise offensive to Marsh's prohibition against proselytization, advancement, or disparagement.

34

The second feature of the Marsh Court's holding this Court finds

instructive is the apparent focus on the cumulative effect of the legislative prayer

practice, rather than on the speech constituting an individual prayer.  That is, the

majority in Marsh seemed to evaluate the constitutional permissibility of prayers

offered in the Nebraska legislature by focusing on the practice as a whole, and

on what could be inferred about the motivation of the legislature in maintaining

that practice over a prolonged period, while simultaneously cautioning against

the judicial dissection of any "*particular* prayer."  See Marsh, 463 U.S. at 795

(emphasis supplied); see also Recent Cases, Tenth Circuit Holds that City May

Deny Opportunity to Deliver Proselytizing Legislative Prayers, 112 HARV. L.

REV. 2025, 2029 (1999)  [hereinafter "Snyder Case Review"] (recognizing that

evaluation of prayer practice should be cumulative in its focus).

Third, Marsh identifies as the focus of the Establishment Clause analysis

the purpose or intent of the legislature, rather than the effects of its practices.  In

particular, it asks whether the prayer opportunity has been "exploited" to

achieve impermissible ends.  Marsh, 463 U.S. at 795.  In this way, like the

Court's prohibition on "impermissible motive" in the selection of clergy, Marsh

35

deems the purposeful preference of one religious view to the exclusion of others

as the primary evil to be avoided in the arena of legislative prayer.

Each of these features of <u>Marsh</u> informs the Court's construction of the

prohibition on exploitation of the legislative prayer opportunity "to proselytize

or advance any one, or to disparage any other, faith or belief[,]" and in

particular, the troublesome inclusion of the "or advance" clause in the Supreme

Court's opinion.  As related previously, federal courts have interpreted this

clause in markedly dissimilar ways.  Some courts, appreciating its juxtaposition

with the prohibition on proselytization, have appeared to read "advancement" in

a similar vein–in effect, a statement meant to "blur" the edges of the

proselytization prohibition to forbid the use of the legislatively provided prayer

opportunity to engage in aggressive advocacy of a particular faith's views, even

where that advocacy does not explicitly call for, or have as its predominant goal,

the conversion of the listener to the speaker's faith.  <u>Cf.</u> <u>Snyder</u>, 159 F.3d at

1234 & n.10; <u>Newdow</u>, 355 F. Supp. 2d at 289.  In contrast, other courts have

stated that a prayer "advances" a particular religious group's views where it

includes any overt sectarian reference or explicitly identifies the deity to whom

the speaker directs his or her prayer.  See Wynne, 376 F.3d at 301; Hinrichs,

400 F. Supp. 2d 1103, 1125-28;[15] see also Stein, 822 F.2d at 1409.

After carefully considering the matter, the Court cannot accept the latter

courts' reading of Marsh and its progeny.  Such a *per se* proscription on any

reference to a deity acknowledged by one faith, or any belief unique to that faith,

would force courts into precisely the position the Supreme Court cautioned

against in Marsh and Lee–in effect, requiring them to assume the role of

regulators and censors of legislative prayer.  Rather, the Court finds the former

reading of Marsh, so long as it is applied with a view to the legislative prayer

practice as a whole, to reflect the better view.  More precisely, it reads Marsh,

including its prohibition on "advance[ment]," to seek to ferret out attempts by

the legislature, through the provision of a prayer opportunity, to demonstrate a

---

[15]The Court notes that both Wynne and Hinrichs, despite their broad holdings that any reference to a sectarian-specific deity in legislative invocations is constitutionally impermissible, were faced with facts that presented rather pronounced endorsements of the Christian religion.  Indeed, both the District Court for the Southern District of Indiana, and, to a lesser extent, the Fourth Circuit, suggested that the prayers before them could fairly be read as "proselytizing efforts."  See Wynne, 376 at 299 n.4 ("the record in this case is replete with powerful 'indication[s]' that the Town Council did indeed 'exploit' the prayer opportunity 'to proselytize or advance' one faith"); Hinrichs, 400 F. Supp. 2d at 1106-08 & 1126 ("Several [prayers] used repeated references to specifically Christian beliefs and doctrine, and some can fairly be described as proselytizing efforts.").

purposeful, official preference for, or allegiance to, a particular sect or faith, or

to promote the virtues of one faith to the exclusion of others.

Of course, having said that, the Court does not imply that the <u>Marsh</u>

Court made the content of legislative invocation, or even explicit appeals to a

deity unique to one faith, an altogether irrelevant consideration in the broader

First Amendment calculus.  Plainly, it did not.  Where the invocation of

sectarian concepts or beliefs, viewed from a cumulative perspective, reaches a

certain level of ubiquity and exclusivity, the appearance of a legislative

preference for one particular faith may well become constitutionally intolerable.

However, so long as the inclusion of sectarian references does not reveal a

legislature's "exploitation" of the prayer opportunity to achieve the promotion

or disparagement of a particular religious view, <u>Marsh</u> instructs that the

Establishment Clause will not be offended by maintenance of the deeply rooted

historical practice of legislative invocation.  Only if a legislature breaches these

prohibitions does the Establishment Clause thrust upon courts the unenviable

task of attempting to craft an injunction that will cure the evils of such sectarian

allegiance.  <u>See</u> <u>Marsh</u>, 463 U.S. at 795 ("The content of the prayer is not of

concern to judges *where, as here*, there is no indication that the prayer

opportunity has been exploited to proselytize or advance any one, or to

disparage any other, faith or belief.  *That being so*, it is not for us to embark on

a sensitive evaluation or to parse the content of a particular prayer.") (emphasis

supplied).

      c.     Evaluating the Impact of Allegheny

Marsh is the centerpiece of the Supreme Court's legislative prayer

jurisprudence.  It is the only case in which the Court has been directly

confronted with the constitutionality of the practice, and the only case that

directly purports to articulate a "test," independent from Lemon, that governs

this unique area of the First Amendment landscape.  That said, any analysis of

the issue would be incomplete without considering the Supreme Court's 1989

decision in  County of Allegheny v. ACLU, 492 U.S. 573, 109 S. Ct. 3086, 106

L. Ed. 2d 472 (1989).  The Court therefore considers here what Allegheny adds,

if anything, to the legislative prayer analysis.

To recapitulate for ease of reference, there, in a case considering the

constitutionality of a holiday display under Lemon, the Court rejected Justice

Kennedy's suggestion that the Establishment Clause should be construed to

permit "[n]oncoercive government action within the realm of flexible

accommodation or passive acknowledgment of existing symbols . . . unless it

benefits religion in a way more direct and more substantial than practices that are

accepted in our national heritage."  See Allegheny, 492 U.S. at 604-05 (rejecting

position taken by dissent) & 662-63 (Kennedy, J., dissenting).  The five-Justice

majority declined to read Marsh as mandating such a result, stating:

> However history may affect the constitutionality of
> nonsectarian references to religion by the government,
> history cannot legitimate practices that demonstrate
> the government's allegiance to a particular sect or
> creed.
>
> Indeed, in Marsh itself, the Court recognized that not
> even the "unique history" of legislative prayer [cit.]
> can justify contemporary legislative prayers that have
> the effect of affiliating the government with any one
> specific faith or belief.  [Marsh, 463 U.S. at 794-95.]
> The legislative prayers involved in Marsh did not
> violate this principle because the particular chaplain
> had "removed all references to Christ."  [Cit.]  Thus,
> Marsh plainly does not stand for the sweeping
> proposition Justice KENNEDY apparently would
> ascribe to it, namely, that all accepted practices 200
> years old and their equivalents are constitutional today.

Allegheny, 492 U.S. at 603.  Moving beyond this reflection on Marsh, the Court

continued,

> Whatever else the Establishment Clause may mean
> (and we have held it to mean no official preference

40

even for religion over nonreligion, [cit.]), it certainly
means at the very least that government may not
demonstrate a preference for one particular sect or
creed (including a preference for Christianity over
other religions).  "The clearest command of the
Establishment Clause is that one religious
denomination cannot be officially preferred over
another."  Larson v. Valente, 456 U.S. 228, 244, 102
S. Ct. 1673, 1683, 72 L. Ed.2d 33 (1982).  There have
been breaches of this command throughout this
Nation's history, but they cannot diminish in any way
the force of the command.

Allegheny, 492 U.S. at 605.

That language, in the view of this Court, is open to two interpretations.

Initially, it could be read as a *per se* prohibition on the inclusion of any sectarian

references, no matter how laconic, *pro forma*, or innocuous they might

otherwise appear.  In this way, Allegheny would proscribe, quite literally, any

practice that had the "effect" of suggesting an "affiliation" or a connection

between the government and a particular system of religious belief.  Legislative

bodies at the national, state, and local level could continue to permit invocations,

but only when such invocations were tailored to the American civil religion.  The

Court is aware that certain lower courts have ascribed to this view.  See, e.g.,

Wynne, 376 F.3d at 301 (holding unconstitutional legislative prayer "contain[ing]

41

explicit references to a deity in whose divinity only those of one faith believe");
Stein, 822 F.2d at 1409 (applying Marsh to case involving school
commencement invocation, and holding that allowance of public prayer was
limited to those prayers that "do[ ] not go beyond the 'American civil religion'
");  Hinrichs, 400 F. Supp. 2d at 1125-28 (reading Marsh to proscribe
references to sectarian concepts in legislative prayers).

Alternatively, the aforementioned language in Allegheny could be read, as
it relates to legislative prayer, to condemn only those government practices
which send a message that the government harbors some purpose of preferring
one religious sect to the exclusion of others.  That is, as reaffirming the
principle, common to both Lemon and Marsh, that a governmental subdivision
cannot convey the appearance that it wishes to align itself with a particular
denominational view.  "Affiliation," insofar as it is proscribed, would only be
that of a demonstrable, "official preference" for a specific sect.  Under this
reading, sectarian references in legislative prayer would not be inherently
constitutionally offensive, but instead, would merely be one factor in a broader
Establishment Clause analysis.  Cf. Snyder, 159 F.3d at 1234 & n.10; Newdow,
355 F. Supp. 2d at 289.

42

The Court acknowledges that, read in isolation, the former interpretation of Allegheny is entirely plausible, and, perhaps, is the only one that gives full force to the majority's reflection that Marsh was decided as it was "because the particular chaplain had 'removed all references to Christ.' " Allegheny, 492 U.S. at 603. Moreover, it provides an attractive and convenient measuring stick for the judiciary–a bright-line rule that would truncate the First Amendment inquiry into an efficient survey of challenged legislative prayer for impermissible text. But for at least three reasons, the Court cannot accept this reading of Allegheny, and instead views the latter reading to be the correct one.[16]

---

[16]The Court fully appreciates that it may be difficult to reconcile its holding and the Allegheny Court's observations respecting the outcome of Marsh. And it does not divert from the dicta of the Supreme Court lightly. See United States v. City of Hialeah, 140 F.3d 968, 974 (11th Cir. 1998) ("[D]icta from the Supreme Court is not something to be lightly cast aside.") (quoting Peterson v. BMI Refractories, 124 F.3d 1386, 1392 n. 4 (11th Cir.1997)). That said, for the reasons that follow, it feels constrained to read that dictum narrowly in order to avoid doing violence to other Supreme Court precedent. Further, the Court notes that any inconsistency between its view and the observation in Allegheny that Marsh was decided the way it was because the chaplain had "removed all references to Christ" is substantially ameliorated when one considers the "references" that were removed. As the example quoted by Justice Stevens in his Marsh dissent makes clear, the references to Jesus and exclusively Christian theological concepts in the chaplain's pre-1980 invocations were pervasive:

> "Father in heaven, the suffering and death of your son brought life to the whole world moving our hearts to praise your glory. The power of the cross reveals your concern for the world and the wonder of Christ crucified.

AO 72A
(Rev.8/82)

First, reading <u>Allegheny</u>'s prohibition on sectarian "affiliation" with

---

> "The days of his life-giving death and glorious resurrection are approaching. This is the hour when he triump[h]ed over Satan's pride; the time when we celebrate the great event of our redemption.

> "We are reminded of the price he paid when we pray with the Psalmist:

> 'My God, my God, why have you forsaken me, far from my prayer, from the words of my cry?

> 'O my God, I cry out by day, and you answer not; by night, and there is no relief for me.

> 'Yet you are enthroned in the Holy Place, O glory of Israel!

> 'In you our fathers trusted; they trusted, and you delivered them.

> 'To you they cried, and they escaped; in you they trusted, and they were not put to shame.

> 'But I am a worm, not a man; the scorn of men, despised by the people.

> 'All who see me scoff at me; they mock me with parted lips, they wag their heads:

> 'He relied on the Lord; let Him deliver him, let Him rescue him, if He loves him.' Amen."

<u>Marsh</u>, 463 U.S. at 823 n.2 (Stevens, J., dissenting). It might well be that sustained allowance of such prayers by a chaplain employed by the legislature could cultivate in the mind of a reasonable listener the impression of a purposeful alignment between the legislature and the Christian faith. But that issue was not directly before the Court in <u>Allegheny</u>, and is not before the Court here.

AO 72A
(Rev.8/82)

sufficient breadth could effectively overturn the Supreme Court's earlier ruling in

Marsh.  Broadly interpreted, such a rule could easily be read to disallow the

prolonged tenure of a denominationally affiliated clergyman as a legislature's

chaplain, or any allusion, no matter how subtle, to a belief unique to one

religious faith.  Such a reading would be irreconcilable with the holding of

Marsh, both in its rejection of the respondent's challenge to Chaplain Palmer's

sixteen year tenure, and in its admonition that "it is not for [the judiciary] to

embark on a sensitive evaluation or to parse the content of a particular prayer."

Marsh, 463 U.S. at 793-95; see also supra, Part II.A.2.b.  Because the Court

cannot assume that the Allegheny majority–even one composed predominantly

of Marsh dissenters–elected to silently overrule the 1983 decision, see

Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.

Ct. 1917, 104 L. Ed. 2d 526 (1989) ("If a precedent of this Court has direct

application in a case, yet appears to rest on reasons rejected in some other line

of decisions, the [lower courts] should follow the case which directly controls,

leaving to this Court, the prerogative of overruling its own decisions.");

Newdow v. Eagen, 309 F. Supp. 2d 29, 40-41 (D.D.C. 2004) ("This court has

no authority to conclude that the Supreme Court's ' "more recent cases have,

45

by implication, overruled an earlier precedent." ' ") (quoting United States v. Weathers, 186 F.3d 948, 957 n.12 (D.C. Cir. 1999)); see also Simpson, 404 F.3d at 281 n.3 ("Nothing in Allegheny suggests that it supplants Marsh in the area of legislative prayer."); it does not ascribe to this view.[17]

        Second, a total constitutional prohibition on the inclusion of any sectarian reference is difficult to square with the majority opinion in Lee.  There, in a decision handed down several years after Allegheny, the Court strongly criticized the efforts of school officials to counsel speakers–invited from the community to give an invocation and benediction at commencement ceremonies–against the inclusion of sectarian speech.  Lee, 505 U.S. at 581 & 588-89.  Such efforts, the Court explained, were not simply insufficient to cure the constitutional violation before it, but were independently suspect under the

---

[17]Although it does not necessarily answer the constitutional question, it is also noteworthy that such a reading of Allegheny would place it at odds with both the historical and the contemporary practices of the United States Congress.  See Newdow, 355 F. Supp. 2d at 285 n.23 ("[I]t is notable that the legislative prayers at the U.S. Congress are overtly sectarian.") (citing Steven B. Epstein, Rethinking the Constitutionality of Ceremonial Deism, 96 COLUM. L. REV. 2083, 2106 (1996) ("within the last six years alone, over two hundred and fifty opening prayers delivered by congressional chaplains have included supplications to Jesus Christ")); Snyder Case Review at 2029 ("From its origins in the Continental Congress to its current manifestation . . . ., the congressional chaplaincy has been the source of 'true sacral prayers, and many of them, true Christian prayers.'  Many of these prayers have been overtly 'sectarian' in that they have appealed directly to Jesus Christ.' ").

First Amendment.  Id. at 588-89 (the "First Amendment does not . . . permit the

government to undertake th[e] task" of ensuring the nonsectarian content of

public prayer by such speakers).  That being so, it is difficult to determine what

measures, short of a total (and, in the view of this Court, unwarranted)

prohibition on the allowance of public prayers by third-party speakers,[18] the

_____

[18]The Court is aware that Judge Lucero of the Tenth Circuit has advocated such a blanket prohibition.  See Snyder, 159 F.3d at 1236 (Lucero, J., concurring).  There, he stated that Marsh should be read as sanctioning legislative prayer "delivered by an established chaplaincy system . . . ."  Id.  He urged that, given Lee's insistence that the government not direct members of the community on how they should pray, even when invited to offer public invocations, the lack of control over such invitee's prayers posed an unacceptable level of constitutional risk that must disallow a practice "wherein prayers are routinely offered, at the [government's] invitation, by members of the public . . . ."  Id. at 1236-43.

    While the Court finds many other aspects of Judge Lucero's reasoning persuasive, it cannot join him in this conclusion.  Accord Simpson, 404 F.3d at 285 (considering challenge to invocational prayer system in which community's "rabbis, imams, priests, pastors, and ministers" were invited to give prayer, stated: "The fact that Chesterfield's invocations are not given by a single, paid chaplain does not deprive the County of Marsh's protection.").  Indeed, the chaplaincy program at issue in Marsh itself involved a component of invitation, as had the historical practice of Congress upon which the decision was predicated.  See Marsh, 788 & n.10 (explaining that 35th Congress temporarily "abandoned the practice of electing chaplains in favor of inviting local clergy") & 793 ("Palmer was not the only clergyman heard by the Legislature; guest chaplains have officiated at the request of various legislators and as substitutes during Palmer's absences.")

    What is more,

            an attempt to make the greater inclusiveness of [an invitation-
            based legislative prayer] policy the very basis of its
            invalidation would achieve a particularly perverse result.  For
            it would push localities intent on avoiding litigation to select

government could undertake to properly "sanitize" legislative prayer of all

sectarian references if that is indeed what <u>Allegheny</u> was read to require.

Finally, recognition of a constitutional "rule" that prohibits only the

appearance of a purposeful preference for one religious view, rather than one

that demands the absence of any association or "affiliation," in the broadest

sense of the concept, with any sect, achieves consonance between <u>Marsh</u>, the

"core" Establishment Clause principles elucidated in <u>Allegheny</u>, and more recent

decisions of the Supreme Court addressing this difficult area of the law.

The Court has already articulated its understanding of <u>Marsh</u>, and will not

restate that interpretation here.  But it takes this opportunity to observe that the

<u>Allegheny</u> majority, in discussing what it perceived as the "central" prohibition

of the Establishment Clause, concentrated on government acts that conveyed an

impression of a deliberate choice to favor one religious view to the exclusion of

others.  For example, immediately after its discussion of <u>Marsh</u>, the Court

explained that the Establishment Clause, at a minimum, "means . . . that

---

> only one minister from only one faith . . . .  This would have
> the consequence of making America and its public events
> more insular and sectarian rather than less so.

<u>Simpson</u>, 404 F.3d at 287.

government may not *demonstrate a preference* for one particular sect or creed (including a preference for Christianity over other religions)." Allegheny, 492 U.S. at 605.  It went on to define the "essential principle" of the Establishment Clause, no matter the nomenclature used to express it, to be that of prohibiting "the government from *appearing to take a position* on questions of religious belief or from making adherence to a religion relevant in any way to a person's standing in the political community." Id.  Although the difference may be subtle, the Court discerns a meaningful distinction between a sweeping prohibition on practices that have *any* "effect of [government] affiliation" or association with a given sect, and an understanding of the concept as one that instead proscribes only the appearance of a purposeful preference of the state for a particular denominational view.  It finds the latter view more accurately embodies the thrust of the Allegheny majority's message.

The Court finds further support for this interpretation in Justice Breyer's recent concurrence in Van Orden v. Perry, 125 S. Ct. at 2868-72 (Breyer, J., concurring).  There, acting as a crucial swing-vote in a case challenging a Ten Commandments display under the First Amendment, Justice Breyer acknowledged that "the Court has found no single mechanical formula that can

accurately draw the constitutional line in every case." Id. at 2868; see also id. at

2869 ("Neither can this Court's other tests readily explain the Establishment

Clause's tolerance, for example, of prayers that open legislative meetings, see

Marsh . . . ."). He emphasized that each case is "fact-intensive[,]" but on the

facts before the Court, concluded that the display in question did not offend the

"underlying purposes" of the First Amendment. Id. at 2869. Finally, after

discussing the history and character of the challenged display, Justice Breyer

wrote:

> If these factors provide a strong, but not conclusive,
> indication that the Commandments' text on this
> monument conveys a predominantly secular message,
> a further factor is determinative here. As far as I can
> tell, 40 years passed in which the presence of this
> monument, legally speaking, went unchallenged (until
> the single legal objection raised by petitioner). And I
> am not aware of any evidence suggesting that this was
> due to a climate of intimidation. Hence, those 40
> years suggest more strongly than can any set of
> formulaic tests that few individuals, whatever their
> system of beliefs, *are likely to have understood the*
> *monument as amounting, in any significantly*
> *detrimental way, to a government effort to favor a*
> *particular religious sect, primarily to promote*
> *religion over nonreligion, to "engage in" any*
> *"religious practic[e]," to "compel" any "religious*
> *practic[e]," or to "work deterrence" of any*
> *"religious belief."* [Cit.] Those 40 years suggest that

50

> the public visiting the capitol grounds has considered
> the religious aspect of the tablets' message as part of
> what is a broader moral and historical message
> reflective of a cultural heritage.

Id. at 2870-71 (emphasis supplied).  That passage, in the view of this Court,

underscores yet again that the "effect" or "appearance" universally prohibited

by the Establishment Clause is one suggesting a deliberate election of the

government to favor or align itself with a particular view, rather than a pure

"effects" test that asks only whether a viewer would perceive *any* association or

"link" between the government and the religious perspective in question.

In sum, the Court does not read Allegheny as transforming Marsh into a

mechanical inquiry that necessarily condemns all references to theological

concepts unique to a given faith in legislative invocations.  Rather, what it

believes Allegheny adds to the Establishment Clause analysis is the principle

that, no matter the semantics employed to state the prohibition, the

Establishment Clause forbids, even in the Marsh context, practices that convey

a purposeful preference for one religious view to the exclusion of others.  In this

way, it clarifies that Marsh's prohibition on legislative "exploitation" of the

prayer opportunity to promote the beliefs of a given sect does not merely target

the subjective motivations of legislative actors in maintaining an invocational

practice, but also condemns those practices that, viewed objectively, send a

message of such conscious official preference.  Cf. also McCreary County v.

ACLU, – U.S. –, 125 S. Ct. 2722, 2734, 162 L. Ed. 2d 729 (2005) ("But

scrutinizing purpose does make practical sense, as in Establishment Clause

analysis, where an understanding of official objective emerges from readily

discoverable fact, without any judicial psychoanalysis of a drafter's heart of

hearts. [Cit.]  The eyes that look to purpose belong to an  objective observer,

one who takes account of the traditional external signs that show up in the text,

legislative history, and implementation of the statute, or comparable official act.

[Cit.]") (internal quotations omitted).

    The Court also finds that Allegheny adds to the Establishment Clause

analysis by alluding to an additional factor, not prominently identified in Marsh,

that may impact this inquiry–the identity of the invocational speaker. Allegheny,

in its succinct reflection on Marsh, stated that the outcome of that case was

consistent with the prohibition on governmental preference "because the

*particular chaplain* [there] had 'removed all references to Christ.' "  492 U.S.

at 603 (emphasis supplied).  While this Court offers no opinion on matters that

are not presently before it, it can certainly appreciate that the public might

perceive little meaningful distinction between a legislatively appointed and

tenured chaplain–such as that which was at issue in Marsh–and the legislative

body that employs him.[19]  "Such chaplains speak for the legislature"; "they are

people who are first and foremost acting as officers of the various legislative

bodies they serve."  Snyder, 159 F.3d at 1238 (Lucero, J., concurring).

Consequently, when a tenured chaplain repeatedly and emphatically underscores

his alignment with a particular faith, the risk of an appearance of an official

preference for the same faith is not insubstantial.

  The same is markedly less true, however, where invocations are offered

by various religious leaders in a local community.  There, the link between the

speaker and the legislature is far more attenuated.  Because of this diluted nexus

between the speaker and the governmental body, the speaker's affiliation with

his own sect or denomination, even if acknowledged during the course of the

---

[19]The same would be true if, for example, a member of the legislature itself
frequently offered the invocation.  See, e.g., Wynne, 376 F.3d at 294 & 296-302 (sectarian
invocations by members of town council, and "often," specific council member, held
unconstitutional).

invocation, is not as likely to project onto the government.[20]  Rotation of the

speaking opportunity among various denominations greatly undercuts the

perception that the legislature has purposefully aligned itself with one religious

viewpoint.  See Newdow, 355 F. Supp. 2d at 289 (in upholding practice of

permitting sectarian references in inaugural prayers, emphasized that, unlike

cases in which "different perspectives on a supreme being were never given a

voice," inaugural prayers were typically given by clergy of different

denominations, and often, a rabbi); cf. Bacus, 52 Fed. Appx. at 356-57 (holding

that prayers, "almost always 'in the Name of Jesus,' did [impermissibly]

advance one faith"; but issuing caveat, "we need not decide whether the prayers

'in the Name of Jesus' would be a permissible solemnization of a legislature-like

body, provided that invocations were, as is traditional in Congress, rotated

among leaders of different faiths, sects, and denominations").        In summary,

the Court does not believe the Supreme Court's precedent in the arena of

---

[20]To be clear, the Court's focus in this regard is on the cumulative appearance of affiliation between the government and the views of a particular speaker.  The Court is not suggesting that inviting private citizens to offer invocations transforms the prayers into purely private speech, exempt from the mandates of the Establishment Clause.  Cf. Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 301-05, 120 S. Ct. 2266, 147 L. Ed. 2d 295 (2000).

AO 72A
(Rev.8/82)

legislative prayer can be reduced to a requirement that all sectarian verbiage be excised from invocations.  Rather, what it perceives as proscribed by the Supreme Court is an impermissible motive in the selection of clergy to provide legislative invocations; an exploitation of the allowance of an invocational opportunity by the legislature to promote the beliefs of one religious sect, or to disparage those of any other; or the maintenance of a practice that conveys the impression that the government has purposely elected to prefer one religious view to the exclusion of those of other faiths.  The focus of each proscription, in all events, is not on a "particular prayer," but on the invocational practice as a whole.

   3. <u>Evaluating Plaintiffs' Likelihood of Success on the Merits</u>

  Plaintiffs insist that they are entitled to injunctive relief because the phrase "in Jesus' name," and similar language, may frequently be found in the invocations given before the Cobb County Commission and Planning Commission.  They argue that "legislative prayers that refer to Jesus, Christ, or Jesus Christ affiliate the government with 'one specific faith or belief' and are thus unconstitutional regardless of the unique history of legislative prayer generally."  (<u>See</u> Mem. in Supp. of Pls.' Mot. for Prelim. Inj. [2] at 16.)  As the

Court's discussion, *supra*, makes clear, it finds this reading of the

Establishment Clause both too mechanical in its application and too myopic in

its scope.  Based on the standards set forth above, and on the record presently

before it, the Court cannot say that Plaintiffs have shown a substantial likelihood

of success in this case.

First, the mechanics of the selection of clergy by the Cobb County

Commissions to provide legislative invocations remains unclear, and Plaintiffs

have not directed the Court to any evidence that would illuminate the County's

motives in this aspect of its decision-making process.  As Marsh itself made

clear, this Court cannot ascribe an impermissible motive to the legislature in its

selection of clergy merely based on the disproportionate (or even exclusive)

representation of one faith behind the invocational podium.

Likewise, there is insufficient evidence before the Court to suggest an

effort by the Cobb County Commissions to "exploit" the legislative prayer

opportunity "to proselytize or advance any one, or to disparage any other, faith

or belief."  Marsh, 463 U.S. at 795.  The prayers at issue did not invariably

contain sectarian Christian references, and indeed, were on a number of

occasions given by non-Christian (*e.g.*, Jewish and Muslim) clergy.  Even the

56

Christian clergy did not always include in their prayers references to Christ.

What is more, the references to exclusively Christian concepts, so far as the

Court can tell from the present record, typically consisted merely of the closing,

"in Jesus' name we pray" (albeit, on rare occasion, with some additional

embellishment).  They did not approach the proselytizing speech rejected in

cases such as <u>Hinrichs v. Bosma</u>, 400 F. Supp. 2d 1103, 1106-08 (S.D. Ind.

2005).[21]  Further, while the percentage of prayers that included *some* reference

_____

[21]By way of contrast, the District Court for the Southern District of Indiana, in <u>Hinrichs</u>, identified several such prayers it found particularly inappropriate:

> The prayer for February 28th began with six verses from Paul's letter to the Colossians, including this passage:
>
> > Let the peace of Christ rule in your hearts, to which indeed you were called in one body; and be thankful. Let the word of Christ richly dwell within you, with all wisdom teaching and admonishing one another with psalms and hymns and spiritual songs, singing with thankfulness in your hearts to God.  Whatever you do in word or deed, do all in the name of the Lord Jesus, giving thanks through him to God the Father.  [Cit.]
>
> The prayer concluded: "I know that You have heard my prayer, and I know that Your precious Son promised that whatever we asked of You in Your holy name [You] will provide.  I ask for all these things in Your Son's most holy name." [Cit.]
>
> . . .
>
> The prayer for March 28th included this prayer for worldwide

to "Jesus" or "Christ," in the subset selected by Plaintiffs, is indeed substantial,

> conversion to Christianity: "We look forward to the day when all nations and all people of the earth will have the opportunity to hear and respond to messages of love of the Almighty God who has revealed Himself in the saving power of Jesus Christ." [Cit.]
>
> . . . .
>
> The prayer on April 29th was pervasively Christian in content:
>
>> Today on behalf of every man and woman under the sound of my voice, every representative present in this house of government of the great State of Indiana, I appeal to the God and Father of Jesus Christ, the God of Abraham, Isaac and Jacob, the God of the whole earth, that He would find not only a welcome here, among those whom He has honored to allow to sit in this place of authority, but also hearing ears and perceptive and courageous hearts that would walk in the ways of righteousness, govern in the way of justice, and make right choices . . . . Let it be known today that it is required in leaders that a man be found faithful. That integrity is a requirement of a leader, and that every Representative is a leader before men and God . . . . As a minister of the gospel, I exercise my right to declare this room a hallowed place. I invite into this room, into the proceedings of the day, into the decisions that will [be] made today, to each person, the mighty Holy Spirit of God. Holy Spirit, give these here the mind of Christ . . . I ask this in the name of Jesus Christ.

Hinrichs, 400 F. Supp. 2d at 1106-08.  It also recounted an instance in which a Christian minister was invited by the legislature's Speaker to sing a hymn, "Just a Little Talk with Jesus[,]" in which "[a] number of the legislators, staff, and visitors present in the chamber stood, clapped, and sang along at the invitation of [the clergymen]." Id. at 1107.

this Court is disinclined, especially at this stage of the litigation and under its

reading of the case law, to condemn a practice of legislative prayer based on

numbers alone.[22]

  For many of the same reasons, the Court does not find, on the present

record, that Plaintiffs have a substantial likelihood of demonstrating that the

Cobb County Commissions' practices have resulted in the impermissible

appearance of an official preference for one sect or creed to the exclusion of

others.  Cobb County does not employ a chaplain to provide an invocation, nor

does it typically have one of its members offer the opening prayer, but rather

appears to invite various clergy in the local religious community to offer a prayer

at a single meeting.  To be sure, many of these speakers, in offering their

invocations, identify the deity to whom they direct their prayer.  In that respect,

they surely convey *their* alignment with one religious creed to the exclusion of

others.  But viewed cumulatively, given the diversity in the denominations and

faiths represented, it is difficult to extrapolate from any one speaker's affiliation

---

[22]At one point in their papers, Plaintiffs argue that Cobb County's refusal to instruct invitees to avoid references to Jesus demonstrates the impropriety of the legislative prayer practice.  Especially in light of <u>Lee</u>, which this Court reads as making such admonitions constitutionally suspect, the Court is reluctant to ascribe any impermissible intent to the Commissions in failing to give such an instruction.

59

a preference on the part of the Cobb County government.  Absent any

suggestion to the public or in the record that the inclusion of diverse faiths is

merely a "token" gesture to mechanically avoid judicial intervention, such a

practice, in the view of this Court, militates strongly against a finding that the

practice violates the mandates of the Establishment Clause.

   Furthermore, and as the Court observed above, the sectarian references

cited by Plaintiffs appear rather austere and innocuous when measured against

those found objectionable in cases such as Hinrichs and, indeed, with respect to

prayers offered before 1980, Marsh.  See Marsh, 463 U.S. at 823 n.2 (Stevens,

J., dissenting); Hinrichs, 400 F. Supp. 2d at 1106-08.  From the current record,

there is little to suggest the practice employed by the Commissions gave rise to

an appearance that the legislative forum was opened by the government to allow

speakers to promote a particular religious view, or to expound upon principles

of Christian doctrine unique to that faith.  In light of the foregoing, the Court

cannot say that Plaintiffs have shown a substantial likelihood of showing

impermissible governmental preference for one religious perspective.

   Plaintiffs have not established a substantial likelihood of success on their

Establishment Clause claim.

**B.     The Georgia Constitution**

Plaintiffs likewise contend that Defendants' invocational practice offends two provisions of the Constitution of the State of Georgia: article I, section II, paragraph XII (the "Separation Clause"), and article I, section I, paragraph III (the "Freedom of Conscience Clause").  The Court considers each below.

1.     <u>The Separation Clause</u>

The Separation Clause of the Georgia Constitution, which Plaintiffs allege Defendants violated in Count II of their Amended Complaint, provides:

> No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, cult, or religious denomination or of any sectarian institution.

GA. CONST. art. I, § II, ¶ XII.  Courts applying Georgia law have construed "public treasury" to include the treasuries of municipal corporations, and have defined "sectarian institution" to broadly include institutions "having a common system of faith."  <u>See</u> <u>Bennett v. City of La Grange</u>, 112 S.E. 482, 484-85 (Ga. 1922); <u>see also</u> <u>City of Savannah v. Richter</u>, 127 S.E. 148 (Ga. 1925).  It is clear from the case law that the amount offered "in aid of" the sectarian institution need not be substantial, <u>see</u> <u>Bennett</u>, 112 S.E. at 485 ($75 per month or less to

Salvation Army sufficient to violate clause); <u>see also</u> GA. CONST. art. I, § II, ¶ XII ("*No* money shall ever be taken . . . .) (emphasis supplied), nor need it involve money passing to the religious institution, so long as the institution receives some unique economic benefit thereby.  <u>See</u> <u>City of Savannah</u>, 127 S.E. at 148 (city's assumption of costs of paving assessment against churches, where assessed against other members of community, declared invalid).

Here, the problem with Plaintiffs' claim is that they have not described how the sums at issue (*e.g.*, "cost" of time spent arranging for speaker, cost of stamps) are taken "in aid of" any sect or sectarian institution.  GA. CONST. art. I, § II, ¶ XII.  The record does not reflect any pecuniary benefit, either direct or indirect, conferred by Cobb County upon such groups, nor does it show that any religious organization received financial assistance from the County for the promotion and advancement of its theological views.  Accordingly, Plaintiffs have not demonstrated a substantial likelihood of success on their claim under the Georgia Separation Clause.

AO 72A
(Rev.8/82)

2.     The Freedom of Conscience Clause

The "Freedom of Conscience Clause," which Defendants are alleged to

have violated in Count III of the Amended Complaint, states:

> Each person has the natural and inalienable right to
> worship God, each according to the dictates of that
> person's own conscience; and no human authority
> should, in any case, control or interfere with such right
> of conscience.

GA. CONST. art. I, § I, ¶ III.

Lawsuits charging a violation of that provision of the Georgia

Constitution have typically sought (often unsuccessfully) to obtain an exemption

from a state compelled act on religious grounds, or have sought an exception

from prosecution for engaging in an act, dictated by the tenets of the claimant's

religion, that the law would otherwise hold unlawful.  See, e.g., Anderson v.

State, 65 S.E.2d 848 (Ga. Ct. App. 1951) (challenging school immunization

requirement on Freedom of Conscience Clause grounds); Ferguson v. City of

Moultrie, 29 S.E.2d 786 (Ga. Ct. App. 1944) (valid application of law

prohibiting sale of pamphlets on certain sidewalks to Jehovah's Witness).  The

Georgia Supreme Court, moreover, found the predecessor to the Clause posed

63

no barrier to a mandamus order requiring teachers in public schools to read a

portion of the King James Bible to their

students and pray "[with]in their hearing" each school day.  Wilkerson v. City of

Rome, 110 S.E. 895 (Ga. 1922).

In light of those authorities, Plaintiffs have not persuasively explained how

being exposed to prayers with sectarian references interferes with their "right of

conscience" within the meaning of the Georgia Constitution, nor have they

shown any government-imposed obstacle to their ability to worship (or not) in a

manner they see fit.  In short, Plaintiffs have failed to establish a substantial

likelihood of success on the merits of their Freedom of Conscience Clause

claim.

## III.   Remaining Prerequisites to Obtaining Preliminary Injunctive Relief

Plaintiffs have not carried their burden of showing a substantial likelihood

of success on the merits.  Accordingly, the Court need not consider the

remaining three prongs of the preliminary injunction inquiry.  See Church v. City

of Huntsville, 30 F.3d 1332, 1342-47 (11th Cir. 1994) ("when a plaintiff fails to

establish a substantial likelihood of success on the merits, a court does not need

to even consider the remaining three prerequisites of a preliminary injunction").

In any event, Plaintiffs' arguments in support of irreparable harm,

comparative injury, and public interest are all predicated on the assumption that

the practices employed by Cobb County's Commissions run afoul of the First

Amendment.  Because the Court finds that assumption open to considerable

doubt, Plaintiffs' Motion for Preliminary Injunction [2-1] is **DENIED**.

### Conclusion

Plaintiffs' Motion for Preliminary Injunction [2-1] is **DENIED**.

**SO ORDERED** this <u>13th</u> day of January, 2006.


<u>/s/ Richard W. Story</u>
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

65