**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| GARY PELPHREY a/k/a "BATS," | : | |
| EDWARD BUCKNER, | : | |
| ROBERTO MORAES, WESLEY | : | |
| CROWE, JEFFREY SELMAN, | : | |
| MARIE SHOCKLEY, and | : | CIVIL ACTION NO. |
| ROBERTA "BOBBI" | : | 1:05-CV-2075-RWS |
| GOLDBERG, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| COBB COUNTY, GEORGIA; | : | |
| SAM OLENS, in his official | : | |
| capacity as Chairman of the Cobb | : | |
| County Commission and in his | : | |
| individual capacity; PHILLIP T. | : | |
| "MURRAY" HOMAN, in his | : | |
| official capacity as Chairman of | : | |
| the Cobb County Planning | : | |
| Commission and in his individual | : | |
| capacity, | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

In this action, seven Cobb County taxpayers challenge the invocation

practices of the Cobb County Board of Commissioners (the "Board") and the

Planning Commission (collectively, the "Commissions").  Plaintiffs argue that

"sectarian prayers" offered by invited guests who participate in the invocation opportunity provided by the Commissions–and, in particular, those prayers mentioning "Jesus," "Christ," or "Jesus Christ"–violate the Establishment Clause of the First Amendment to the United States Constitution.  (See Am. Verified Compl. [5] at Preliminary Statement.)[1]  Plaintiffs seek a judgment (i) declaring that Defendants' "sponsorship" of sectarian prayers is constitutionally impermissible; (ii) enjoining Defendants "from knowingly and intentionally allowing sectarian prayers at County government meetings, making any further expenditures of public funds, and taking any further action to sponsor sectarian prayers at Cobb County government meetings; and requiring the Defendants, their successors, and assigns to advise anyone conducting a prayer as part of the City Council meeting that sectarian prayers are not permitted"; (iii) awarding them nominal damages, costs, and fees.  (See id. at Prayer for Relief.)

        In an Order dated January 13, 2006 [26], the Court denied Plaintiffs' motion for preliminary injunction.  See Pelphrey v. Cobb County, Ga., 410 F.

---

        [1] In their Amended Complaint, Plaintiffs additionally assert that the practice offends certain provisions of the Georgia Constitution.  The Court expressed its serious doubts as to the merits of any such claim in its July 13, 2006 Order [26] denying Plaintiffs' Motion for Preliminary Injunction, and Plaintiffs have not pursued the issue further in their summary judgment papers.

Supp. 2d 1324 (N.D. Ga. 2006).  In doing so, it relied extensively on the

Supreme Court's 1983 decision in <u>Marsh v. Chambers</u>, 463 U.S. 783, 103 S. Ct.

3330, 77 L. Ed. 2d 1019 (1983), in which a majority of the Court, citing

legislative prayer's "unambiguous and unbroken history of more than 200

years," upheld a challenged legislative invocation practice.  <u>See</u> 463 U.S. at

791.  After carefully examining the contours of the majority's holding in <u>Marsh</u>,

the Court found that Plaintiffs had failed in their burden to show a substantial

likelihood of success on the merits.  <u>Pelphrey</u>, 410 F. Supp. 2d at 1349.

In denying Plaintiffs' motion, this Court rejected their assertion that the

Supreme Court's decision in <u>Marsh</u> "only applies to *nonsectarian* legislative

prayer," and that "legislative prayers that refer to Jesus, Christ, or Jesus Christ .

. . are unconstitutional regardless of the unique history of legislative prayer

generally."  <u>See</u> Pls.' Mot. for Prelim. Inj. [2] at 15-16 (emphasis in original);

<u>see also</u> <u>Pelphrey</u>, 410 F. Supp. 2d at 1339 (so holding).  While acknowledging

the judicial economy that could be achieved by adopting such a *per se* rule, the

Court found the import of <u>Marsh</u> to be more nuanced:

> [T]he Court does not believe the Supreme Court's
> precedent in the arena of legislative prayer can be
> reduced to a requirement that all sectarian verbiage be

excised from invocations.  Rather, what it perceives as proscribed by the Supreme Court is an impermissible motive in the selection of clergy to provide legislative invocations; an exploitation of the allowance of an invocation opportunity by the legislature to promote the beliefs of one religious sect, or to disparage those of any other; or the maintenance of a practice that conveys the impression that the government has purposely elected to prefer one religious view to the exclusion of those of other faiths.  The focus of each proscription, in all events, is not on a "particular prayer," but on the invocation practice as a whole.

Pelphrey, 410 F. Supp. 2d at 1345-46.

Since this Court's January 2006 decision, the parties to this litigation have engaged in extensive discovery, and have now submitted cross-motions for summary judgment.  Having reviewed the record, the Court now enters the following Order.

## Factual Background

The core facts giving rise to this controversy are, for the most part, undisputed.  To the extent factual issues exist, moreover, the parties have consented to have such issues decided by the Court on the basis of the materials in the record.  (See June 8, 2006 Order [37] at ¶ 6.)[2]

_____

[2] The Court endeavors to set forth in this section those facts which are undisputed. For ease of reference, it supports its summary of the facts with citations to the parties'

AO 72A
(Rev.8/82)

I.      **The Practices of the Commissions**

A.      **The Invocation Practice**

The Commissions have long maintained a practice of beginning each legislative meeting with an invocational prayer and the Pledge of Allegiance. (See Pls.' Statement of Material Facts [52] at ¶¶ 49 & 66 [hereinafter "PSMF"]; Defs.' Statement of Material Facts [49] at ¶¶ 13 & 23 [hereinafter "DSMF"].) The prayer is not provided by a member of the Commissions or a paid chaplain, but typically, an individual selected from one of the community's many religious institutions.  (See DSMF at ¶¶ 14-15.)  The individuals providing the prayer receive no compensation for their service, although the County expends funds (both in terms of physical materials and time) in selecting, inviting, and thanking volunteers.  (See PSMF at ¶¶ 62-65, 74-77; DSMF at ¶ 15.)

At the beginning of each Board meeting, the Chairman introduces the invocational speaker and the person selected to recite the Pledge, and invites those who wish to do so to stand.  (See DSMF at ¶¶ 60-61.)  The practices employed by the Planning Commission are similar.  (See DSMF at ¶ 89.).

---

respective Statements of Undisputed Facts.  To the extent a genuine issue could be said to exist *vis-a-vis* any fact set forth in this decision, the Court's recitation of that fact  may be construed as a finding under Federal Rule of Civil Procedure 52.

The evidence presented by Defendants suggests that "the large majority of religious institutions in Cobb County are Christian[.]" (See Richardson Aff. [13] ¶ 12; Martin Aff. [13] ¶ 12.)[3] Likewise, and perhaps not surprisingly, the overwhelming majority of invocational speakers, to the extent their faiths can be identified from the record, are Christian. (See Richardson Aff. [13] ¶ 12; Martin Aff. [13] ¶ 12.) Indeed, data compiled by the ACLU indicate that, between January 1988 and August 2005, 96.6% of the speakers providing the invocation at Commission meetings, to the extent their "faith was discernable," were Christian. (See PSMF at ¶¶ 2 & 28.)[4] During this time, adherents to the Jewish and Unitarian Universalist faiths also provided invocations, and, more

---

[3] Defendants state that the Christian churches account for approximately 98% of the houses of worship in Cobb County. (See Defs.' Resp. to Pls.' Mot. for Summ. J. [63] at 15-16.) Due to the questionable validity of the data used by Defendants to support their statistics, however, the Court does not adopt them here as conclusive proof of the religious demographics of Cobb County. (See Pls.' Reply in Supp. of Mot. for Summ. J. [65] at 11 & n.8 (detailing inaccuracies).)

[4] In recent years, these numbers have begun to decline somewhat. For example, in the Cobb County Board of Commissioners, from 2001 to 2005, the percentage of Christian speakers (out of those persons whose "faith was discernable") ranged from 89% to 95%. (PSMF at ¶¶ 11-14.) In the Cobb County Planning Commission, which meets only eleven times a year, the percentage of Christian speakers during the same time period ranged from 86% to 100%. (See PSMF at ¶¶ 32-35 & 66.)

recently, a Muslim Imam from the County's only mosque has also offered the

opening prayer.  (<u>See</u> PSMF at ¶¶ 3 & 28.)[5]

As it relates to the content of the challenged invocations, discovery has

produced little that was not before the Court at the time it ruled on the

preliminary injunction motion.  The County plays no role in the pre-censorship

of an invited speaker's prayer, and does not appear to direct speakers respecting

the proper boundaries of invocational prayer.  (<u>See</u> DSMF at ¶ 18.)[6]  A survey

of transcribed invocations over the last decade indicates that 70% of the

invocations given before the Board, and 68% of those given before the Planning

Commission, contained some sectarian, Christian reference–figures slightly

lower than this Court assumed in its January 13, 2006 decision.  <u>See</u> PSMF at

---

[5] In 1998, an Imam from the Islamic Center of Atlanta also provided the invocation before the Planning Commission. (<u>See</u> Parikh Aff. [52] at Attach. 2.) Moreover, in 1991, a representative from a local Baha'i assembly gave the invocation before the Board of Commissioners. (<u>Id.</u> at Attach. 3.)

[6] Plaintiffs attempt to counter this point by directing the Court to the deposition testimony of Tim Lee, a Cobb County Commissioner.  Mr. Lee testified, in response to a series of hypotheticals, that he would probably make a point of order and ask the Chairman to interrupt a speaker who began shouting obscenities, discussing matters that would be heard by the Board, disparaging other religions, or disparaging citizens. (<u>See</u> Lee Dep. at 36-40.)  There is no evidence that the Commissions have ever been confronted with such incidents, however, nor is there evidence that any speaker has been informed of these or other probable restrictions on the content of permissible invocations.

7

¶¶ 15 & 36; <u>Pelphrey</u>, 410 F. Supp. 2d at 1326 n.3.[7]  These references, though varied, typically took the form of references to "our Heavenly Father" or "in Jesus' name we pray."  (<u>See</u> DSMF at ¶¶ 19-21.)  A review of the record reveals only a minority of occasions where more lengthy or elaborate references were made to a particular religion's scripture or concepts unique to one faith.  (<u>See</u> Parikh Aff. [52] at Attachs. 1 & 2.)

During this time, Christian, Jewish, and Muslim speakers all recited prayers that Plaintiffs characterize as "sectarian."  (<u>See</u> <u>id.</u>)[8]  The prayers

---

[7] As it relates to the Board, the number of what the ACLU deems "Christian-specific" references have declined somewhat in recent years.  Beginning in 2003, when Cobb County citizens first voiced concerns about the invocation practice, the number of sectarian references dropped significantly, approaching the 50% mark.  (<u>See</u> PSMF at ¶¶ 24-25.)  Although Plaintiffs attribute this decline to their complaints and the actions of the ACLU, the impetus behind the decline remains unclear.  Notably, there is no indication that the individuals responsible for selecting invocational speakers knew of the complaints, or directed the volunteers to alter the content of their prayers.

A similar decline was not seen in invocations provided before the Planning Commission.  (<u>See</u> <u>id.</u> at ¶¶ 45-47.)

[8] Some of the prayers denominated as "sectarian" by Plaintiffs appear, at least to the Court, rather ecumenical.  For example, Plaintiffs label the following prayer, given by a Baptist minister, as "sectarian":

> And as we think of the time of the year when men turn their thoughts toward the great moral aspect and the recognition of a power that is greater than we, whether it be Ramadan or Chanukah or Christmas or Quansa, whatever the case me be, we thank you that men do look to a higher power.  We thank you and praise you, and we appreciate you.  And I pray

offered by many clergy, however, including some who were invited back on multiple occasions, were bereft of any sectarian reference.  (<u>See</u> DSMF at ¶ 21; <u>see also</u> Defs.' Reply in Supp. of Mot. for Summ. J. [64] at 7 n.5.)

### B.    Selection of the Speaker

In its last Order, this Court observed that the record, as it then stood, did "not describe the precise process employed by the County to select a speaker for any given Commission meeting."  <u>See</u> <u>Pelphrey</u>, 410 F. Supp. 2d at 1326. While the record respecting the identity of invocational speakers and content of the invocations has changed little since that time, the parties have conducted extensive discovery respecting the selection process, and a much clearer picture of the Commissions' practices is now before the Court.

It appears that the responsibility for selecting invocational speakers is that of an administrative specialist (*vis-a-vis* the Board) and a deputy clerk (*vis-a-vis* the Planning Commission) employed by the County.  (<u>See</u> PSMF at ¶¶ 53 & 70; DSMF at ¶¶ 27, 30, 73-76.)  Both are essentially given autonomy in the selection of speakers, and employ different methods of selection.

---

personally in Jesus' name.  Amen.

(<u>See</u> Parikh Aff. [52] at Attach. 1 at 20.)

9

The administrative specialist who selects speakers on behalf of the Board, Ms. Martin, compiles a list of religious organizations in Cobb County, which she pulls from a variety of sources, including, *inter alia*, the Yellow Pages, the Internet (including the Chamber of Commerce website), as well as business cards and leaflets she finds at public functions and receives through the mail. (DSMF at ¶¶ 33-35; PSMF at ¶¶ 54-55.)  Although a seemingly rare occurrence, moreover, Ms. Martin has also received information respecting certain religious organizations from Board members, including, in 2004, information about the County's mosque.  (See DSMF at ¶¶ 38-41; PSMF at ¶ 56.)  She has never been approached by an "ordinary" citizen of Cobb County respecting invocational speakers, either to submit recommendations or to complain about the County's practices.  (DSMF at ¶¶ 45-46.)

The list compiled by Ms. Martin is entitled, "Places of Worship," and comprises five pages of spreadsheets (hereinafter, the "Master List").  It is organized alphabetically according to denomination and/or faith, and, within each denomination or faith, by the name of individual congregations.  (See DSMF at ¶ 37.)  The overwhelming majority of organizations identified on this list are Christian, although among them there is great diversity in denomination

and cultural affiliation (*e.g.*, Brazilian, Korean).  (See PSMF at ¶ 57; Def. Ex. 23 [49-27].)  In addition, the Master List contains contact information for three Jewish Synagogues, a Unitarian Universalist Congregation, and the Masjid Al-Hedaya Mosque.  (See Def. Ex. 23.)  From this Master List, Ms. Martin randomly selects organizations from a number of denominations and/or faiths, and then contacts those organizations to inquire about a religious leader's willingness to provide the invocation.  (See DSMF at ¶¶ 50-55; PSMF at ¶ 61.) She endeavors to avoid having speakers from the same religious group speak during consecutive meetings.  (Id.)

Ms. Martin has testified repeatedly that she does not take into account the beliefs held by a religious group in deciding whom to include on her Master List.  (See Martin Aff. [13-3] at ¶ 11; Martin Dep. [46] at 81.)  The evidence is also undisputed that she has only removed religious leaders from her Master List because (i) she has learned that the organization is not in the County; (ii) the organization's staff has not returned her calls; or, on rare occasions, (iii) a particular organization or leader has asked not to be included on the list. (DSMF at ¶ 48.)

11

Having said that, there is evidence that Ms. Martin had information in her files, and in particular, a print-out from the Chamber of Commerce website, identifying a Jehovah's Witness congregation and a Baha'i assembly, but those organizations do not appear on the Master List.  (See PSMF at ¶ 57; Pls.' Br. in Supp. of Mot. for Summ. J. [52] at 6; Martin Dep. at 66-67.)  Although Ms. Martin offers equivocal testimony that she intended to contact the Baha'i assembly (and identifies notes she made updating the assembly's address), and that the Jehovah's Witness congregation may have been stricken because of "previous information" given to her by her predecessor,[9] she admits failing to recall the precise reasons for the omissions.  (See Martin Dep. at 66-68 and Ex. 12.)

There is also evidence that Ms. Martin had a list in her files identifying a Church of Jesus Christ of Latter Day Saints, but that faith similarly fails to appear on the Master List.  (See PSMF at ¶ 60.)  The directory containing that

---

[9] Earlier in her deposition, Ms. Martin explained that her predecessor informed her that Jehovah's Witnesses, as well as members of the Church of Jesus Christ of Latter Day Saints, declined invitations to provide invocations on the basis of their beliefs.  (See Martin Dep. at 18-19, 36-37.)  Defendants, in an effort to bolster this explanation, point to what they contend is the official website of the Jehovah's Witnesses, tending to indicate that such separation between church and state is indeed a tenet of the faith.  This latter evidence, however, does not appear to be in admissible form, and is therefore not considered by the Court.

information, which is several pages long, shows question marks next to both the Mormon church and a Jehovah's Witness congregation.  (Id.; see also Martin Dep. at Ex. 6.)  Ms. Martin failed to specifically recall why those marks were placed on the list, but testified that it was her practice to place question marks next to organizations she "was [probably] going to try to contact . . . again." (See Martin Dep. at 32, 37-38.)

Plaintiffs also complain that Ms. Martin's list omits other religious groups located in Cobb County, including a Buddhist Assembly, a Hindu Temple, three Messianic Jewish congregations, and a Christian Science church. (See PSMF at ¶ 57.)  They appear to concede, however, that these organizations are not listed in the Yellow Pages.  (See Parikh Aff. at ¶ 29.)

The practice employed by the deputy clerk on behalf of the Planning Commission, Ms. Richardson, differs from that used by Ms. Martin.[10]  Ms. Richardson, like her predecessor, relies primarily on the Yellow Pages to locate religious organizations whose leaders might be interested in providing the invocation, although, more recently, she also began contacting leaders who

_____

[10] During the pendency of this litigation, Ms. Richardson "switch[ed] positions," and now serves as an administrative supervisor.  (See Richardson Dep. at 4.)

13

volunteer as part of the Chaplain Program for the Cobb County Police and Fire Departments.  (See DSMF at ¶¶ 76-78; PSMF at ¶ 71.)  She has never received requests from her supervisors or any Planning Commission member respecting which leaders to invite to provide the invocation.  (See DSMF at ¶¶ 79-80.)  Like Ms. Martin, moreover, Ms. Richardson has indicated that she made attempts to ensure that different denominations were represented at Planning Commission meetings.  (See PSMF at ¶ 74.)

A copy of the phonebook used by Ms. Richardson in 2003-04 shows a dark, straight, continuous, vertical line through the categories listed in the Yellow Pages surrounding "Churches."  (See Def. Ex. 28 [49-32].)  For example, Chiropractors, Church Furnishings, and Church Supplies & Services, and then Cigar & Cigarette Accessories and Circuit Board Assembly Repairs are crossed out.  (Id.)  There is also a similar, somewhat lighter line drawn through a series of listings on the lower lefthand corner of one page in the phonebook, drawn continuously through Churches-Islamic, Churches-Jehovah's Witnesses, Churches-Jewish, and Churches-Latter Day Saints.  (Id.; see also Richardson Dep. at 15.)  No similar line is drawn through any other

denomination or religious group.  (See PSMF at ¶ 72; Richardson Dep. at 12-13.)

Although Ms. Richardson purported not to recall making this notation on her copy of the phonebook, she responded "No" to the inquiry, "Would someone else be making notations on your phone book list?"  (See Martin Dep. at 11; see also id. at 18.)  She also stated that she did not "have a recollection at this point" as to why these groups were crossed-out, but testified that "[g]enerally [the notation] would indicate that [she] had some contact at some point and generally was refused."  (See Richardson Dep. at 13.)   The record indicates that none of the faith groups struck out in the 2003-04 copy of the phonebook were asked to provide an invocation during those years.  (See PSMF at ¶ 72.)

The 2005 copy of the Yellow Pages does not contain these notations. Rather, the County's mosque has a star next to it, and all of the synagogues are "checked."  (See Richardson Dep. at Ex. 18.)  Ms. Richardson contacted both a synagogue and a mosque in 2005 to provide the invocation, and it is clear that at least one Jewish Rabbi gave the opening prayer.  (See PSMF at ¶¶ 35 & 72.)

15

## II.     Plaintiffs' Objections to the Invocation Practice

Prior to initiating this lawsuit, Messrs. Selman, Crowe, and Pelphrey voiced their opposition to the invocation practice employed by the Commissions.  (See PSMF at ¶¶ 88-90; DSMF at ¶¶ 63-64.)  Mr. Selman, moreover, provided a list of proposed speakers to Commissioner Tim Lee and Planning Commissioner Bob Ott.  (See PSMF at ¶ 89.)  This list included a Hindu individual, a United Unitarian, and an Atheist, as well as a Jewish Rabbi. (See Defs.' Ex. 27 [49].)  It also provided contact information for Muslim, Mormon, and Buddhist organizations, and enumerated several other religious groups for which Mr. Selman listed no proposed speaker or contact information (e.g., Agnostic, Shinto, Taoist, and Wiccan).  (Id.)

Neither commissioner provided Mr. Selman's suggestions to the administrative personnel tasked with selecting invocational speakers, although at least one of the identified speakers already appeared on Ms. Martin's Master List.  (Id.)  The Court has been directed to no testimony provided by Mr. Ott explaining his reasons for not passing along Mr. Selman's proposals.  Mr. Lee explained, albeit confessing his lack of precise recollection, that he did not pass the list along to Ms. Martin because he understood Mr. Selman's objections to

16

be directed at the invocation practice itself, and, in any event, did not know to whom the list should be given.  (<u>See</u> DSMF at ¶¶ 66-67; <u>see also</u> <u>id.</u> at ¶ 65 (explaining that the list was given to Mr. Lee relatively early in his tenure as a Commissioner).)

Cobb County additionally received correspondence from the ACLU asking that they remove sectarian references from the invocations.  (<u>See</u> Am. Verified Compl. [5] at Ex. G.)  When the Commissions declined to alter the challenged practices after receiving these requests, Plaintiffs, represented by the ACLU, brought suit.  They summarized their grievances as follows:

> The Plaintiffs object to the sectarian prayers at Cobb County government meetings because they invoke a specific god – a Christian God – to the exclusion of all other Gods.  The Plaintiffs are offended and often feel repressed by this practice.  Each time they attend a government meeting the Plaintiffs are affronted by Defendants' overtly Christian prayers and subject to unavoidable and unwelcome religious messages sponsored by the County.  Mr. Pelphrey believes that the government's use of sectarian prayer is demeaning to his religion.  The prayers cause other Plaintiffs to feel like outsiders in their own community and unwelcome at government meetings.  Furthermore, they are offended because the sectarian prayers are an unconstitutional endorsement of religion and because the prayers trivialize religion.

AO 72A
(Rev.8/82)

(<u>See</u> Am. Verified Compl. ¶ 18.)

**Discussion**

**I.      Preliminary Matters**

The Court begins its discussion by commending counsel for both

Plaintiffs and Defendants for the considerable acumen they have demonstrated

in presenting well-prepared, thoughtful briefs respecting this complex area of

constitutional law.  Before turning to the merits of the parties' respective

positions, moreover, the Court takes this opportunity to address certain

arguments raised by Plaintiffs in their most recent filings.  <u>See</u> <u>Pelphrey</u>, 410 F.

Supp. 2d 1324.  Because those contentions, directly or indirectly, take issue

with the standards this Court will apply in evaluating the constitutionality of the

Commissions' practices, they will be addressed here, before the Court

endeavors to apply those standards to the facts of this case.

Initially, Plaintiffs suggest that the Court invented a novel paradigm for

evaluating the ability of an invocation practice to survive Establishment Clause

scrutiny.  (<u>See</u> Pls.' Br. in Supp. of Mot. for Summ. J. [52] at 9, 25-26.)  They

submit "that <u>Marsh</u> is the more appropriate test to apply to legislative prayers"

(<u>see</u> <u>id.</u> at 9), and that that "test" can best be understood as "whether a

18

legislative prayer practice *frequently* includes sectarian prayers."  (Id. at 26 (emphasis supplied).)  Plaintiffs contend that they do not presently take, and indeed, have never taken the position that the inclusion of isolated sectarian references makes an invocation practice unconstitutional (see id. at 10; Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. [61] at 11), but rather, only argue that the *frequency* of the sectarian references involved in the instant case offends the Establishment Clause.

The Court finds Plaintiffs' arguments troubling in several respects.  First, it is difficult to reconcile Plaintiffs' current position, which concedes that *some* level of sectarian content is permissible in the context of legislative prayer, with that taken earlier in this litigation.  (See Pls.' Mot. for Prelim. Inj. [2] at 15-16 (asserting that Marsh "only applies to *nonsectarian* legislative prayer," and that "legislative prayers that refer to Jesus, Christ, or Jesus Christ . . . are unconstitutional regardless of the unique history of legislative prayer generally") (emphasis in original).)  Insofar as Plaintiffs have now retreated somewhat from their earlier espoused *per se* rule, it appears that any disparity between the approach taken by the Court in its January 13, 2006 Order and that

19

advocated by Plaintiffs here may be more one of degree than of limited

permissibility versus total proscription.

Second, Plaintiffs' contention that the Court "formulated" a new standard

to be applied in the context of legislative prayer is an inaccurate depiction of

what the Court endeavored to accomplish in its January 13, 2006 Order.  This

Court, addressing Plaintiffs' Motion for a Preliminary Injunction, sought to

apply faithfully the holding of <u>Marsh v. Chambers</u>, 463 U.S. 783, 103 S. Ct.

3330, 77 L. Ed. 2d 1019 (1983).  It acknowledged:

> <u>Marsh</u> is the centerpiece of the Supreme Court's
> legislative prayer jurisprudence.  It is the only case in
> which the Court has been directly confronted with the
> constitutionality of the practice, and the only case that
> directly purports to articulate a "test," independent
> from <u>Lemon</u>, that governs this unique area of the First
> Amendment landscape.

<u>See</u> <u>Pelphrey</u>, 410 F. Supp. 2d at 1339.

To be sure, this Court's construction of <u>Marsh</u> does not comport with that

which Plaintiffs would have it adopt.  And, the Court concedes that, while not

unique, <u>see</u> <u>Snyder v. Murray City Corp.</u>, 159 F.3d 1227, 1234 (10th Cir. 1998)

(en banc) (rejecting proposition that "the mere fact a prayer evokes a particular

concept of God is . . . enough to run afoul of the Establishment Clause");

20

Newdow v. Bush, 355 F. Supp. 2d 265, 289 (D.D.C. 2005) (isolated sectarian references, without more, insufficient to offend Establishment Clause), its reading of the decision is in tension with that articulated by the Fourth, Seventh, and Ninth Circuits.  See Wynne v. Town of Great Falls, S.C., 376 F.3d 292, 301 (4th Cir. 2004) ("The invocations at issue here, which specifically call upon Jesus Christ, are simply not constitutionally acceptable legislative prayer like that approved in Marsh." ); cf. Hinrichs v. Bosma, 440 F.3d 393, 395 (7th Cir. 2006) (split panel) (denying stay pending appeal of lower court order enjoining sectarian prayers as unconstitutional, with disclaimer: "We hope that, by proceeding in this manner, the tentative nature of our analysis at this very early point in the litigation will be plain to all."); Simpson v. Chesterfield County Board of Supervisors, 404 F.3d 276, 283 (4th Cir. 2005) (continuing to apply Wynne, but with emphasis on fact that, there, the invocations, offered by council members, were "pervasively and exclusively sectarian in nature"); Bacus v. Palo Verde Unified Sch. Dist. Bd. of Edu., 52 Fed. Appx. 355, 356-57 (9th Cir. 2002) (unpublished decision) (holding that "the [challenged] prayers, almost always 'in the Name of Jesus,' did [impermissibly] advance one faith"; but issuing caveat, "we need not decide whether the prayers 'in the Name of

AO 72A
(Rev.8/82)

Jesus' would be a permissible solemnization of a legislature-like body, provided that invocations were, as is traditional in Congress, rotated among leaders of different faiths, sects, and denominations").

But adopting a minority view, or even accepting a different construction of a seminal decision, is not tantamount to judicial inventiveness, and this Court does not understand its task as that of conducting a headcount among the federal courts.  Despite the fact that <u>Marsh</u> is now over twenty years old, this area of the law remains in its nascency, with no apparent consensus having yet emerged respecting the decision's appropriate contours.  <u>See</u> Marjorie A. Shields, <u>Constitutionality of Legislative Prayer Practices</u>, 2006 A.L.R. 6th 3 (2006) (discussing recent litigation challenging invocational prayer practices); <u>see also</u> <u>Hinrichs</u>, 440 F.3d at 403 (Kane, J., dissenting) ("A key dispute in this case, as it appears now, is whether <u>Marsh</u> rests on a line drawn between sectarian and nonsectarian legislative prayer.  While there is caselaw supporting the proposition that <u>Marsh</u> approves of only nonsectarian legislative prayer, there still remain powerful arguments to the contrary, not the least of which is the <u>Marsh</u> majority's curious ambiguity on the point.").  This Court acknowledged in its prior Order the apparent tension among the Supreme

22

Court's decisions in <u>Marsh</u>, 463 U.S. 783, <u>Lee v. Weisman</u>, 505 U.S. 577, 112
S. Ct. 2649, 120 L. Ed. 2d 467 (1992), and <u>County of Allegheny v. ACLU</u>, 492
U.S. 573, 109 S. Ct. 3086, 106 L. Ed. 2d 472 (1989), as well as the several
conflicting authorities cited *supra*.  Ultimately, however, it concluded that to
read into the Establishment Clause an absolute proscription of sectarian
references during legislative invocations would do violence to <u>Marsh</u>.  To the
extent that Plaintiffs challenge this Court's interpretation as contrary to what is
presently the majority view, this Court acknowledged as much in its January 13,
2006 Order, and, respectfully, maintains its disagreement with those decisions
that read <u>Marsh</u> as pronouncing a non-sectarian mandate.  To be clear, however,
this Court has always understood its obligation to be strict application of the
precedent set by <u>Marsh</u>, and it has never encouraged the adoption of a "new"
rule of constitutional law applicable to invocational prayer.

 The Court additionally declines to accept Plaintiffs' argument that
<u>Marsh</u> is properly interpreted as mandating a "straight-forward test" which
asks "whether a legislative prayer practice frequently includes sectarian
prayers."  (<u>See</u> Pls.' Br. in Supp. of Mot. for Summ. J. [52] at 25-26.)  Initially,
the very idea of a "straight-forward" Establishment Clause analysis seems to

the Court somewhat of an oxymoron.  No message of <u>Van Orden v. Perry</u>, 545

U.S. 677, 125 S. Ct. 2854, 162 L. Ed. 2d 607 (2005), and <u>McCreary County v.

ACLU</u>, 545 U.S. 844, 125 S. Ct. 2722, 2734, 162 L. Ed. 2d 729 (2005), is

more clear than that the Establishment Clause tends to elude clear, black-and-

white formulations of legality.

    And, even if a straight-forward test were attainable in this unique niche

of First Amendment law, the Court reads nothing in <u>Marsh</u> to indicate that

infrequency is the touchstone for constitutionality.  The Establishment Clause,

as a general matter, tends to insist upon evaluations made in view of all the

facts and circumstances surrounding a controversy.  Although the parties in

this case have presented their arguments largely in the form of statistics, this

Court has already expressed its disinclination to resolve the constitutionality of

an invocation practice "on numbers alone."[11] <u>Pelphrey</u>, 410 F. Supp. 2d at

1347.

---

[11]Though "numbers alone" will not resolve the issue, the Court acknowledges that
the pervasiveness of the practice can bear on the analysis of whether the government is
maintaining "a practice that conveys the impression that the government has purposely
elected to prefer one religious view to the exclusion of those of other faiths."  <u>Pelphrey</u>,
410 F. Supp. 2d at 1346.

Plaintiffs additionally argue that this Court was incorrect insofar as it viewed <u>Marsh</u> and <u>Lee</u> to erect an absolute prohibition on judicial or legislative censorship of invocational prayer.  They support their argument that no such prohibition exists with citations to the decisions, cited *supra*, where circuit courts of appeal have imposed injunctions proscribing sectarian references in such prayers, as well as certain language found in Justice Scalia's dissenting opinion in <u>Lee</u>.  <u>See</u> <u>Lee</u>, 505 U.S. at 640 (Scalia, J., dissenting) (finding characterization of principal's suggestion that speaker avoid sectarian references as "control" of prayers "difficult to fathom").

Although the Court can appreciate Plaintiffs' argument (no matter how difficult it is to reconcile with the majority's reasoning in <u>Lee</u>), even assuming that <u>Marsh</u> and <u>Lee</u> left room for government intervention into the composition of invocational prayer, it would not change this Court's understanding of the fundamental "test" <u>Marsh</u> requires it to apply in this context.  Whether couched in terms of a prohibition or a pronounced disinclination, one cannot read <u>Lee</u> or <u>Marsh</u> and perceive any open invitation for the government to play a role in the composition or regulation of invocational prayer.  <u>See</u> <u>Lee</u>, 505 U.S. at 588 ("It is a cornerstone principle of our Establishment Clause jurisprudence that 'it is

25

no part of the business of government to compose official prayers for any

group of the American people to recite as a part of a religious program carried

on by government[ ]' . . . .") (quoting <u>Engel v. Vitale</u>, 370 U.S. 421, 425, 82 S.

Ct. 1261, 1264, 8 L. Ed. 2d 601 (1962)); <u>Marsh</u>, 463 U.S. at 794-95 ("The

content of the prayer is not of concern to judges where, as here, there is no

indication that the prayer opportunity has been exploited to proselytize or

advance any one, or to disparage any other, faith or belief.  That being so, it is

not for us to embark on a sensitive evaluation or to parse the content of a

particular prayer.").  Stated differently, irrespective of whether a violation of

<u>Marsh</u> compels a court to enjoin sectarian references or ban an invocation

practice altogether, the "test" for constitutionality, in the view of this Court,

remains the same.

**II.      Analysis**

As the Court explained in its January 13, 2006 Order,

> what it perceives as proscribed by the Supreme Court
> [in the context of invocational prayer] is an
> impermissible motive in the selection of clergy to
> provide legislative invocations; an exploitation of the
> allowance of an invocation opportunity by the
> legislature to promote the beliefs of one religious
> sect, or to disparage those of any other; or the

> maintenance of a practice that conveys the
> impression that the government has purposely elected
> to prefer one religious view to the exclusion of those
> of other faiths.

Pelphrey, 410 F. Supp. 2d at 1345-46.  It is now the task of the Court to apply

those standards to the facts developed through discovery.

In their papers, Plaintiffs have identified three features of the Cobb

County Commissions' practices they deem offensive.  First, they complain that

the overwhelming number of speakers are adherents to the Christian faith.

Second, they take issue with what they perceive as "frequent" sectarian

references in the prayers offered by invitees.  Finally, they urge that the

selection procedures employed by the Commissions are violative of the

Establishment Clause.  Although, as Plaintiffs recognize, the "invocation

practice [must be evaluated] as a whole[,]" see Pelphrey, 410 F. Supp. 2d at

1345-46, the Court, in the interest of clarity, addresses each challenged aspect

of the invocation practice separately.[12]  It finds the practices employed by the

_____

[12] There is also persuasive authority suggesting that, while the focus of the court's
inquiry should be on a legislature's *practice*, rather than on a particular prayer, the
selection and identity of speakers should be analyzed separately from the content of the
prayer.  See Simpson, 404 F.3d at 282-87 (analyzing content of prayer and selection
procedures separately); see also id. at 286 ("The Court, neither in Marsh nor in
Allegheny, held that the identity of the prayer-giver, rather than the content of the prayer,

Planning Commission violative of the Establishment Clause, but reaches a

contrary conclusion as to the Board.

### A.    Identity of Speakers, Content of Prayers

Although the identity of the invocational speakers and the content of

their speech was the impetus behind this lawsuit, the Court finds itself with

very little to add to its previous discussion of these matters.  For all the reasons

set forth in its January 13, 2006 Order, the Court does not find either attribute

of the Commissions' invocation practices offensive to the principles embodied

in Marsh.

First, relying on the fact that well over 90% of the speakers who

provided the invocation over the past several years were Christian does little to

advance Plaintiffs' case.  In Marsh itself, the Supreme Court itself found

nothing constitutionally impermissible in the nearly uninterrupted sixteen year

tenure of one Presbyterian minister as chaplain for the Nebraska legislature.

Marsh, 463 U.S. at 793-94.  To find the high percentage of Christian speakers

here renders the County's practices unconstitutional would be difficult to

reconcile with that holding.

---

was what would 'affiliat[e] the government with any one specific faith or belief.' ").

28

Likewise, invitees' inclusion of sectarian references in their invocations does not, in the view of this Court, compel a finding of unconstitutionality. While the record now contains a much more exhaustive picture of the invocations offered before the Cobb County Commissions, the Court's earlier observations respecting the content of the opening prayers remain virtually unchanged:

> The prayers at issue did not invariably contain sectarian Christian references, and indeed, were on a number of occasions given by non-Christian (e.g., Jewish[, Unitarian,] and Muslim) clergy.  Even the Christian clergy did not always include in their prayers references to Christ.  What is more, the references to exclusively Christian concepts, so far as the Court can tell from the present record, typically consisted merely of the closing, "in Jesus' name we pray" (albeit, on . . . occasion,[13] with some additional embellishment).
>
> . . .
>
> Cobb County does not employ a chaplain to provide an invocation, nor does it typically have one of its

---

[13] Reviewing the transcripts of the invocations provided by Plaintiffs, it appears, in all candor, that while infrequent, the sectarian references perhaps more than "rare[ly]" exceeded this brief ending.  It remains the case, however, that the substantial majority of the references Plaintiffs deem "sectarian" never went beyond this concluding language, or minor variations thereof.  In any event, the record as it now stands is not so different from that initially presented to the Court to warrant a contrary result.

29

members offer the opening prayer, but rather appears
to invite various clergy in the local religious
community to offer a prayer at a single meeting.  To
be sure, many of these speakers, in offering their
invocations, identify the deity to whom they direct
their prayer.  In that respect, they surely convey *their*
alignment with one religious creed to the exclusion
of others.  But viewed cumulatively, given the
diversity in the denominations and faiths represented,
it is difficult to extrapolate from any one speaker's
affiliation a preference on the part of the Cobb
County government.  Absent any suggestion to the
public or in the record that the inclusion of diverse
faiths is merely a "token" gesture to mechanically
avoid judicial intervention, such a practice, in the
view of this Court, militates strongly against a
finding that the practice violates the mandates of the
Establishment Clause.[14]

Furthermore . . . , the sectarian references cited by
Plaintiffs appear rather austere and innocuous when
measured against those found objectionable in cases
such as Hinrichs and, indeed, with respect to prayers
offered before 1980, Marsh. See Marsh, 463 U.S. at
823 n. 2, 103 S. Ct. 3330 (Stevens, J., dissenting);
Hinrichs, 400 F. Supp. 2d at 1106-08.  From the

---

[14] While, as explained below, the Court finds certain aspects of the selection
practices maintained by the Planning Commission during 2003-04 troubling, it remains
unpersuaded that "the inclusion of diverse faiths is merely a 'token' gesture to
mechanically avoid judicial intervention . . . ."  Pelphrey, 410 F. Supp. 2d at 1347.
Viewed as a whole, the Planning Commission's consistent practice of including other
faiths in the invocation opportunity (which itself arises only eleven times a year) militates
against such a finding.  (See PSMF at ¶¶ 28 (recognizing that non-Christian speakers,
including adherents to the Jewish, Unitarian, and Muslim faiths, provided the invocation
in 1994, 1998, 2002, and 2005).)

> current record, there is little to suggest the practice
> employed by the Commissions gave rise to an
> appearance that the legislative forum was opened by
> the government to allow speakers to promote a
> particular religious view, or to expound upon
> principles of Christian doctrine unique to that faith.

See Pelphrey, 410 F. Supp. 2d at 1346-48 (emphasis in original).

What is more, it is now clear that, contrary to Plaintiffs' earlier

contentions, sectarian references were not relegated to allusions to the

Christian tradition.  Volunteers from surrounding synagogues and the Islamic

Center of Atlanta also included in their prayers references to concepts central

to Judaism or to Islam.  (See Parikh Aff. [52] at Attachs. 1 & 2 (recounting

instances where rabbis' invocations included references to Passover, Hebrew

prayers, scriptures contained in the Torah, and the menorah, as well as an

instance in which a Muslim Imam "[p]rais[ed] . . . Allah, the cherisher and

sustainer of the words[,]" "thank[ed] God for sending us Prophet

Mohammed[,]" and recited verses from the Koran).  To be sure, mirroring the

proportion of the speakers from these faiths, such references were more

infrequent than those made to Christian concepts.  Nevertheless, such diversity

in the content of the invocations tends to further militate against a finding that

31

the Commissions' practices have "been exploited to proselytize or advance any one, or to disparage any other, faith or belief[,]" <u>Marsh</u>, 463 U.S. at 795, or that they "have the effect of affiliating the government with any one specific faith or belief." <u>Allegheny</u>, 492 U.S. at 603.

In light of the foregoing, the Court remains unpersuaded that either the identity of the invocational speakers present at Cobb County Commission meetings, or the content of their prayers, takes the challenged practices outside of boundaries drawn by <u>Marsh</u>.

**B.      Selection Procedures**

Although not prominently identified in their original filings, Plaintiffs now take issue with the selection procedures employed by the Commissions to select invocational speakers.  <u>Marsh</u> made clear that, while not easily established, such a challenge was viable under the Establishment Clause.  As explained by this Court in its January 13, 2006 Order,

> The first boundary erected to legislative prayer by the Supreme Court relates to the intent of the legislature in its selection of the speaker meant to deliver the invocation.  In <u>Marsh</u>, the respondent argued that the Nebraska Legislature's practice violated the Establishment Clause because the same Presbyterian clergyman had delivered the opening prayers for

32

sixteen years.  Quickly disposing of this argument, the Court rejected the idea that "choosing a clergyman of one denomination advances the beliefs of a particular church."  [Cit.]  After underscoring that "guest chaplains have officiated at the request of various legislators and as substitutes during Palmer's absences[,]" the Court went on to hold:  "*Absent proof that the chaplain's reappointment stemmed from an impermissible motive*, we conclude that his long tenure does not in itself conflict with the Establishment Clause."  [Cit.]

The Court did not elaborate in <u>Marsh</u> on what motive or motives it would find "impermissible."  Read in context, however, the "impermissible motive" prohibition seems directed at the conscious selection of a speaker from one denomination or sect for the purpose of promoting or endorsing the beliefs held by that speaker.  That is, the Court appeared to deem constitutionally unacceptable the selection and retention of a particular speaker *because* of that speaker's sectarian affiliation or religious beliefs.  [Cit.]

The Court indicated, moreover, that the bar for proving such impermissible motive is quite high.  It found the virtually uninterrupted sixteen year tenure of a single Presbyterian minister insufficient to demonstrate any "preference" for a particular faith.  Instead, it appeared to envision more pronounced evidence of a legislative purpose to sanction one religious viewpoint as a necessary predicate for declaring a legislature's selection of clergy a violation of the Establishment Clause.

33

Pelphrey, 410 F. Supp. 2d at 1336.

Here, the Court approaches the improper motive inquiry by evaluating three aspects of the selection procedures Plaintiffs appear to deem offensive. First, it considers their challenge that using the Yellow Pages to select invocational speakers is itself problematic under the Establishment Clause. Second, the Court evaluates what appears to be an improper motive challenge predicated on Commission members' failure to pass along suggestions provided by Mr. Selman to the administrative personnel responsible for overseeing the selection process. Finally, it considers the specific methods employed by both the Board and the Planning Commission.

Plaintiffs' first argument is summarized in their papers as follows:

> Limiting the search for clergy to the Yellow Pages is intrinsically biased towards large, wealthy, well-established, and Christian churches. To advertise in the Yellow Pages, a faith group must go through procedures to place the advertisement and must pay for the advertisement. Thus, the Cobb invocation may only be given by clergy who have the money, time, and resources to buy a Yellow Pages advertisement. And, even faiths with such resources may not choose to have a Yellow Pages advertisement. For example, there is at least one Hindu Temple, one Bahaii Assembly, and one Buddist [sic] congregation in Cobb County, yet none

34

> appear in the sections of the Yellow Pages . . . .
> None of these houses of worship have been
> represented at the Planning Commission meeting,
> perhaps because of the Commissions['] mechanism
> for inviting clergy.

(See Pls.' Br. in Supp. of Mot. for Summ. J. [52] at 15 n.6.)  Even accepting

the logic of Plaintiffs' argument, the Court struggles to discern how it is

germane to the instant analysis.

Contrary to what Plaintiffs suggest in their papers, "diversity" among the

faiths represented at legislative functions has never been the *sine qua non* of

constitutional legitimacy.  See Marsh, 463 U.S. at 793-94 (rejecting argument

that sixteen year tenure of Presbytrian minister was offensive to Establishment

Clause); see also Pls.' Br. in Supp. of Mot. for Summ. J. [52] at 17 n.9 ("the

current practice does not achieve the diversity required by the Court or claimed

by the Defendants").  To be sure, it may lend support to a finding that a

particular invocation practice has not crossed the boundaries erected by Marsh

and (insofar as it proscribes the appearance of affiliation) Allegheny.  But

Marsh, as the Court reads it, was never intended to serve as a vehicle for

challenging selection procedures on the basis of "disparate impact."  Absent

evidence that the phonebook was purposefully used as a device for stifling

35

diversity, the Court discerns nothing troubling about selection procedures that rely, in whole or in part, on the Yellow Pages.

Although a slightly closer case, moreover, the Court does not find Commissioner Tim Lee and Planning Commissioner Bob Ott's failure to pass along Mr. Selman's list of potential speakers, local religious organizations, and, in some cases, bare identifications of select faiths (and non-faiths) indicative of an "improper motive."  The record to which this Court has been directed is bereft of evidence which would illuminate the motivations, if any, behind Mr. Ott's apparent failure to provide that list to Ms. Richardson. Moreover, the evidence strongly suggests that Mr. Lee's decision not to pass the information along was the consequence of his unfamiliarity with the Board's process for selecting invocational speakers, and, to a lesser degree, his misunderstanding as it related to the nature of Mr. Selman's objection.

What is more, it does not appear, in any event, that it was the practice of either the Board or the Planning Commission to accept suggestions from members of the public respecting whom to invite to provide invocational prayers.  Messrs. Lee and Ott's  failure to depart from that practice in the

instant case does not lead the Court to find that their inaction was the product

of any "improper motive" as that term was used in <u>Marsh</u>.

That brings the Court to the varied selection procedures employed by the

Board and the Planning Commission.  Based on the materials in the record, the

Court finds no constitutional violation as to the Board, but concludes that the

practices employed by the Planning Commission, at least during 2003-04,

transgress the boundaries established by <u>Marsh</u>.

First analyzing the practices employed by Ms. Martin on behalf of the

Board, the Court recognizes that certain faiths were not represented on her

"Master List," notwithstanding being identified in papers contained in her files

(from which she admittedly extracted other contact information).  At least three

factors, however, lead the Court to reject an inference that such omissions were

the product of an improper motive–*i.e.*, predicated on a potential speaker's

sectarian affiliation or religious beliefs.  <u>See</u> <u>Marsh</u>, 463 U.S. at 793; <u>Pelphrey</u>,

410 F. Supp. 2d at 1336.

Initially, the faiths that *are* included on Ms. Martin's Master List are

quite diverse.  Alongside denominationally and culturally heterogeneous

Christian organizations, she lists three synagogues, one Unitarian Universalist

37

congregation, and the County's only mosque.   The inclusion of such

organizations militates strongly against a finding that Ms. Martin's omission of

other non-Christian or "non-traditional"[15] Christian organizations was

calculated to exclude those religious leaders on the basis of their non-

adherence to (traditional) Christian teachings.

Second, while Ms. Martin admits not recalling precisely why she

omitted certain organizations from her Master List, she has provided credible

explanations (oftentimes corroborated by documentary evidence) for those

omissions, and these explanations do not evince an improper motive to engage

in discrimination on the basis of the content of any given faith.

For example, Ms. Martin testified that she was informed by her

predecessor that religious leaders belonging to the Jehovah's Witness and

Mormon denominations declined to provide invocations on the basis of their

religious beliefs, indicating that extending any further invitations to those

organizations would be futile.  What is more, her notes indicate that she may

---

[15] This is the term used by Plaintiffs to describe both Mormons and Jehovah's
Witnesses.

38

have nevertheless intended to contact such organizations again to inquire about their interest in participating in the Board's invocation opportunity.

Likewise, though she does not include a Baha'i assembly on the Master List, she offered her belief that the mark by the assembly on her papers may have indicated that she intended to contact the organization.  Indeed, her notes reflect that she updated the address of the assembly, which would be inconsistent with a determination to exclude the organization from the invocation opportunity, whether on the basis of its adherence to the Baha'i faith or otherwise.

Third, there is the unequivocal deposition testimony Ms. Martin offered, in which she not only denied excluding any religious group on the basis of their beliefs, but disclaimed any understanding of the beliefs held by many of the organizations Plaintiffs now accuse her of improperly excluding from her Master List:

> Q:    Have you ever removed someone from the list
>        or decided not to place them on the list because
>        of how they worship or what they believe in?
>
> A:    No.

Q:     Do you know, have any knowledge yourself, of what Jehovah's Witnesses do or don't believe in?

A:     No.

Q:     How about Seventh Day Adventists?

A:     No.

Q:     How about Church of Latter-Day Saints?

A:     No.

Q:     Did their belief structures, their manner of praying, anything like that, have anything to do with why they don't appear on your list?

A:     No.

(See Martin Dep. at 81.)

In light of the foregoing, the Court finds the evidence insufficient to sustain a finding of improper motive in connection with the selection of religious leaders to participate in the Board's invocation opportunity. The same is not true, however, as it relates to the Planning Commission.

It appears that Ms. Richardson's practice, at least during 2003-04, was to select religious leaders from a phonebook. As mentioned previously, the Court finds nothing inherently problematic in using a phonebook as a tool to identify

40

potential invocational speakers.  But it appears from the record before the

Court that certain faiths were categorically excluded from the list of

prospective speakers based on the content of their faith.  Indeed, the same type

of line that excludes Chiropractors, Cigar & Cigarette Accessories dealers, and

Circuit Board Assembly repair persons from the prayer opportunity also

excludes Churches-Islamic, Churches-Jehovah's Witnesses, Churches-Jewish,

and Churches-Latter Day Saints.

What is more, the Court does not credit the explanation that the long,

continuous mark was used simply to identify those organizations with whom

Ms. Richardson "had some contact at some point and [the offer to provide the

invocation] generally was refused."  (Richardson Dep. at 13.)  As it relates to

other, "traditional" Christian faiths, a leader's disinclination to provide the

invocation on a particular occasion would result in a single mark or strike-

through being placed next to his or her *particular* organization.  It was never

the case that a religious group was wholly excluded based on a single church's

decision to decline the invitation to provide the opening prayer.  In contrast,

Ms. Richardson concedes that she did not contact, *e.g.*, every Jehovah's

Witness congregation listed in the phonebook before striking the entire faith

from consideration for future invocation opportunities.  (See Richardson Dep. at 11-15, 17-18.)  In the view of this Court, not even "the spacious boundaries set forth in Marsh[,]"  Simpson, 404 F.3d at 284, can accommodate a practice that categorically excludes these faiths from the invocation opportunity on the basis of their religious identity.[16]

To be sure, Ms. Richardson's practice, even before she was shifted out of the position of deputy clerk, had changed.  In the 2005 copy of the Yellow Pages, no such line removes, *e.g.*, the County's synagogues and its mosque from consideration, and it appears from the record that such organizations have now been extended invitations to offer invocations at Planning Commission meetings.  But, it is well-established that "a defendant's voluntary cessation of a challenged practice does not deprive the federal courts of power to determine the legality of the practice."  See Ala. v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1131 (11th Cir. 2005).  Rather, "[v]oluntary cessation of a challenged practice will only moot a case if 'subsequent events made it absolutely clear

---

[16] The Court acknowledges that at least one court has held that a government body may constitutionally restrict the "pool" from which it draws prospective speakers to "monotheistic congregations[.]"  See Simpson, 404 F.3d at 284-87.  This Court does not have such a restriction before it, and expresses no opinion as to whether Simpson was correctly decided in that regard.

that the allegedly wrongful behavior could not reasonably be expected to recur.' " Id. (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc., 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)).  Here, the Court finds no such clarity, and accordingly holds that Plaintiffs are entitled to judgment in their favor insofar as they challenge the selection procedures employed by the Cobb County Planning Commission.

## III.    Appropriate Relief

The parties, in their papers, concern themselves primarily with the issue of the constitutionality of the Commissions' invocation practices.  They do not address the issue of appropriate relief.  Consequently, the parties are directed, within twenty (20) days from the date appearing on this Order, to submit filings addressing: (i) the appropriate scope of any injunctive relief; (ii) which Defendant(s) should be made subject to an injunction, and which, if any, should be held liable for nominal damages, costs, and\or fees; and (iii) what measure of nominal damages, costs, and\or fees, if any, should be taxed against Defendants.  Each party shall be permitted eleven (11) days thereafter within which to respond to their opponents' filing.

43

## Conclusion

In accordance with the June 8, 2006 Consent Order [37], the parties' dispositive motions [49 & 52] are **GRANTED in part and DENIED in part**. Plaintiffs have demonstrated that the clergy selection procedures employed by the Cobb County Planning Commission are violative of the Establish Clause as interpreted in <u>Marsh v. Chambers</u>, 463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983). In all other respects, the Court finds the practices challenged by Plaintiffs to withstand constitutional scrutiny.

The parties are **DIRECTED**, within twenty (20) days from the date appearing on this Order, to submit filings addressing: (i) the appropriate scope of injunctive relief; (ii) which Defendant(s) should be made subject to an injunction, and which, if any, should be held liable for nominal damages, costs, and\or fees; and (iii) what measure of nominal damages, costs, and\or fees, if any, should be taxed against Defendants. Each party shall be permitted eleven (11) days thereafter within which to respond to their opponents' filing.

44

**SO ORDERED** this __8th__ day of September, 2006.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE